## CHAIN BELT CO. v. UNITED STATES.
### No. 49292.
United States Court of Claims.

Sept. 30, 1953.

Jackson M. Bruce, Milwaukee, Wis., Wood, Warner, Tyrrell & Bruce, Milwaukee, Wis., on the brief, for plaintiff.

**704**

Thomas L. McKevitt, Washington, D. C., with whom was Ralph J. Luttrell, Washington, D. C., Acting Asst. Atty. Gen., Garry V. Fisher, Arlington, Va., on the brief, for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

LITTLETON, Judge.

In this suit the plaintiff seeks to recover damages in the amount of $267,-223.74, for breach of contract arising out of defendant's failure to move its machinery out of a portion of the premises purchased by plaintiff from defendant on the date agreed to in the contract of sale, and defendant's failure to repair damage caused to the floors as a result of the moving operation when it was performed. The damages alleged and claimed by plaintiff to have resulted from such breach consist of the cost of $42,098.68 to plaintiff of repairing the floors damaged by the machinery removal methods employed by defendant's moving contractor; the cost of utilities and services in the sum of $34,888.30 for the period following the agreed removal date during which time the Government-owned machinery remained in plaintiff's plant; the cost of $2,191.52 to plaintiff of removing some of the Government-owned machinery when it became apparent that the Government was not going to be able to complete the moving by the agreed date; and plaintiff's losses in the sum of $178,045.24 resulting from its inability to make profitable use of that area of the plant containing the Government-owned machinery for the above period.

Plaintiff is a Wisconsin corporation with its principal office located at 1600 West Bruce Street, Milwaukee. For many years plaintiff has been one of the country's leading manufacturers of construction and conveying machinery employing chain transmission, and owning plants in Massachusetts and in Wisconsin. Plaintiff had five plants in the Milwaukee area including Plant No. 1, located at 1600 West Bruce Street, where its chain manufacturing operations were carried on.

In December 1941, the United States, through the Defense Plant Corporation, constructed in the Village of West Milwaukee, on land previously purchased from plaintiff, a large factory-type building designed for use in the production of gun barrels and related military equipment. During the war these premises were leased to plaintiff corporation which thereafter manufactured military materials therein under contracts with the defendant until the lease was terminated on October 18, 1945. From that time until September 10, 1946, plaintiff continued in possession of the plant pursuant to an informal understanding with defendant, whereby plaintiff provided protection and maintenance services for the whole building and utilized some of the plant space for storage of its own materials.[1]

Plaintiff did not exercise a three-months' option contained in the lease to purchase defendant's plant, because it planned instead to construct a new and large plant in which to expand its chain manufacturing business to meet a strong post-war demand for its products. However, because of the availability, good condition and extensive floor space of defendant's plant, plaintiff, in December 1945, commenced negotiations with defendant for the purchase of the gun plant. Plaintiff was also influenced by the fact that defendant's plant could be made ready for use in a much shorter time than would be required to build a new plant. During the course of the negotiations defendant was advised of

[1.] The plant contained much valuable machinery used in the manufacture of military materials, and in July 1946, plaintiff and Reconstruction Finance Corporation (successor to all rights of Defense Plant Corporation) entered into an agreement whereby plaintiff agreed to pay defendant 66 cents per square foot per year for its use of certain areas of the plant, and defendant agreed to pay the cost of the protection and maintenance services performed by plaintiff.

plaintiff's intended use of the plant, of its urgent need of the floor space and its desire to occupy the building in sound, usable condition at the earliest practicable date. On February 20, 1946, plaintiff offered to purchase the property for $1,041,599.97, including certain mechanical equipment and cranes present in the building. In April 1946, plaintiff increased its offer to $1,422,000 and this offer was accepted by defendant in July 1946.

On September 10, 1946, plaintiff and defendant, through War Assets Administration, entered into a contract of sale which provided for the sale to plaintiff of the land, buildings and installations, as listed on attached schedules, for $1,422,000 to be paid in cash upon delivery to plaintiff of a quitclaim deed, which deed defendant agreed to deliver to plaintiff within thirty days. Paragraph Three provided that plaintiff had examined the premises and was satisfied as to their existence and condition. Paragraph Six provided that plaintiff understood that there was located on the premises a great number of items of production equipment, machinery and tools, automotive equipment, laboratory and testing equipment, and furniture and office equipment, which were owned by the Reconstruction Finance Corporation and were not included in the sale of the premises. The parties agreed that such items of machinery, etc., even though affixed to the realty, should be considered to be personal property of the seller and would not pass with the quitclaim deed to be later delivered. Defendant agreed that it would remove the items of machinery in question within 90 days from the date of the delivery of the quitclaim deed. Plaintiff agreed that defendant, its vendees, contractors and other authorized persons should have access to the premises at all reasonable hours "to the end that said property may be exhibited, sold, prepared for shipment, and removed in an orderly manner within said ninety-day period," and that the property might remain on the premises during that period as part of the consideration for the transaction without cost or charge against defendant. Plaintiff further agreed to provide without cost to defendant such facilities and utilities as were on the premises and might be reasonably required to accomplish the purposes mentioned.

In Paragraph Ten plaintiff "certified" and agreed that it was acquiring the premises for its own use and not for the purpose of reselling or leasing it; and that in no case would plaintiff resell or lease the premises within three years from the date of the contract without first obtaining written authorization from the War Assets Administrator.

Although the contract of sale allowed defendant 30 days in which to deliver the quitclaim deed, the deed was delivered to plaintiff on September 11, 1946 (the day following the execution of the contract of sale), at which time plaintiff paid the full purchase price in cash.

Because of the large number of Government-owned machines located on the premises and the manner in which they were installed, it was reasonably to be anticipated that the better part of the stipulated 90 days would be required to effect an orderly removal of such machines. When, by October 1, 1946, defendant had done nothing to prepare for removal of the machinery, plaintiff commenced writing to defendant calling attention to the magnitude of the removal task and to the fact that unless defendant commenced removal operations at once, the plant would not be cleared within the 90-day contract period. Somewhat later, plaintiff pointed out to defendant that further delay in effecting the removal would aggravate the already inevitable damages that would accrue to plaintiff because of plaintiff's inability to fully occupy and use the plant on the promised date, and plaintiff offered to cooperate with defendant in any manner possible to help bring about the timely removal of defendant's property.

On November 25, 1946, defendant finally entered into a contract with the

Shea-Matson Trucking Company for the removal of defendant's machines. On December 4, 1946, War Assets Administration representatives held an on-site sale of some of defendant's machinery, but defendant's removal work did not commence until after that date.

On November 29, 1946, War Assets Administration wrote to plaintiff asking for an extension of the time within which it might remove its property from plaintiff's plant. On December 11, 1946, the day following the date on which the parties had agreed the plant would be completely cleared of Government-owned machinery, etc., plaintiff wrote to defendant disclaiming any responsibility thereafter for any persons or property, other than its own, on or in the vicinity of the plant, and notifying defendant that it expected to be paid damages for the loss of use of the plant, for losses arising from the impairment of its operations, for the cost of utilities and services, and other cash outlays which might be necessitated by the presence of defendant's property in the plant after December 10, 1946.

Following the on-site sale of December 4, 1946, defendant's contractor commenced clearing the areas occupied by Government-owned machinery, and a day-to-day record of the square-foot space not yet cleared was kept jointly by representatives of defendant and plaintiff. Within a very short time plaintiff noted what it considered to be excessive damage being caused to the plant's wood block flooring by the manner in which Shea-Matson Trucking Company was taking up defendant's machines and moving them out of the plant. Plaintiff immediately complained to the War Assets Administration custodian and to the Shea-Matson supervisor, both of whom advised plaintiff that they had no authority to repair any damage caused to the floors. After repeated complaints in which plaintiff contended that it was the obligation of defendant and its contractor to repair all floor damage caused by the removal work carried on by de-fendant's contractor, plaintiff threatened to stop all moving operations. The War Assets Administration custodian then took up the matter with the regional office and that office authorized him to instruct Shea-Matson to replace all wooden blocks removed or damaged, and to make repairs in all places other than in voids left by the removal of machines, which had rested directly upon the concrete flooring.

Shea-Matson was unable to make the floor repairs, so authorized, because it lacked the proper equipment and employees qualified to do that type of work. Accordingly, on January 7, 1947, Shea-Matson wrote plaintiff a letter, counter-signed by the War Assets Administration custodian, which stated that plaintiff was thereby authorized to repair the wood block flooring damaged in the plant clearance program, and to bill Shea-Matson monthly for the labor and materials expended by plaintiff for such repairs. On January 11, 1947, plaintiff's contractor, Klug & Smith Company, commenced the floor repair work in question. The work performed by Klug & Smith covered all the work necessary to put the floors in good condition and included laying wood blocks over the voids left by the removal of some of the machines. Concurrently with the floor repair work, this same company also performed all the accumulated maintenance repair work necessary in connection with plaintiff's occupancy program.

Apparently defendant's representatives considered the quality and extent of the floor repair work being done by Klug & Smith, to be beyond the scope of the January 7th letter of authorization and, on February 20, 1947, defendant's contractor wrote plaintiff advising that it would not be responsible for the cost of any portion of the floor repair work already done or to be done. Despite the ensuing controversy, plaintiff's contractor proceeded with the floor repair work as speedily and economically as possible in order that the plant would be ready for use at the earliest possible date.

Concurrently with defendant's removal work, plaintiff proceeded with its own reconversion work which included the making of preliminary excavations in some areas of the plant. None of this work interfered with the work of defendant's contractor, and it did serve to keep at a minimum plaintiff's losses arising from its inability to obtain the full use of its plant on December 10, 1946.

By the close of business on February 15, 1947, the last of the Government-owned machinery was out of the plant. Floor repair work in those areas, from which Government-owned machinery had been moved, continued until April 19, 1947.

On March 11, 1947, while the floor repair work was still going on, plaintiff submitted its first claim to War Assets Administration in the amount of $69,661. On June 11, 1947, plaintiff increased its claim to $120,625.45 by including therein an amount to cover the cost of floor repairs which had by then been ascertained, and the cost to plaintiff of moving certain Government-owned machines from the south ends of Bays A and B (finding 18). Ultimately, all of plaintiff's claims were denied by defendant.

### Claim for Floor Damage Caused by Defendant's Moving Operations

Plaintiff contends that defendant is liable for *all* repair costs arising out of damage caused to the plant floors by reason of the Government's moving operations, regardless of the question of possible negligence on defendant's part in performing the work. Plaintiff's position is based upon the theory that the portion of the plant occupied by Government-owned machinery was in the possession of defendant and was not delivered to plaintiff until the machinery was moved out. From this, plaintiff argues that until real property contracted to be sold is actually delivered to the buyer, the seller in possession must bear all the loss arising from any damage thereto.

Defendant contends that for the period during which its machinery remained in the plaintiff's plant, defendant was the tenant of the plaintiff and that under applicable Landlord and Tenant law, 51 C.J.S., Landlord and Tenant, § 408, p. 1157, the tenant is liable for only such damages as are unnecessarily or wantonly caused by the removal of improvements which the landlord has allowed the tenant to make, and permits him to remove. Defendant urges that the record in this case does not establish unnecessary or wanton damage on defendant's part in performing the removal work, but that if it does, the plaintiff's claim sounds in tort and is accordingly beyond the jurisdiction of this court.

The above contentions of both plaintiff and defendant are based on the conclusion that under the provisions of paragraph Six of the Contract of Sale, defendant was *in possession* of that portion of the plant containing the machinery which the parties had agreed was personalty belonging to defendant, was reserved from the sale, and should remain in the plant for a period of 90 days from the date of the delivery of the quitclaim deed to the realty. From plaintiff's point of view, defendant's "possession" was that of a vendor under a contract of sale which remained executory as to that portion of the building "possessed" by defendant.[2] Defendant's po-

---

2. The authorities relied on by plaintiff in support of its contentions deal with situations where the so-called "New York Rule" has been applied, i. e., that the burden of loss from damage to realty falls on the party (buyer or seller) in possession of the realty under an executory contract of sale. This "test of possession" has been adopted by a number of other states including Wisconsin.

In Appleton Electric Co. v. Rogers, 200 Wis. 331, 228 N.W. 505, relied on by plaintiff, certain real estate with buildings thereon was the subject of a contract of sale. Pending payment of the balance of the purchase price, the vendor remained in possession and the buildings were, without fault of the vendor, materially damaged by fire before the purchaser had become entitled to posses-

sition seems to be that the contract of sale was fully executed and that defendant's "possession" was that of a tenant of plaintiff.

We cannot agree with the positions taken by either party. The true status of the parties and their respective rights and obligations in connection with the floor damage claim, can be ascertained only in the light of paragraph Six of the contract of sale and the action taken thereunder. What was the relationship between the parties under paragraph Six? The contract of sale was signed by the parties on September 10, 1946. It was provided therein that the provisions relating to the Government-owned machinery should survive the execution and delivery of the quitclaim deed. On the following day, September 11, 1946, defendant delivered to plaintiff the quitclaim deed and plaintiff paid to defendant the entire purchase price in cash. With respect to the property conveyed by that deed, plaintiff was certainly a vendee in possession under an executed contract of sale, with the possible exception of that portion of the plant occupied by the Government-owned machinery.

Paragraph Six of the contract of sale provided that certain specified machinery, whether affixed to the realty or not, was, by agreement of the parties, to be considered the personal property of defendant and was not to pass with the quitclaim deed. Defendant agreed to remove its machinery within 90 days from the date of delivery of the quitclaim deed, and plaintiff, vendee, agreed that the seller, its vendees, contractors and other persons authorized by the seller, should have access to the premises at all reasonable hours "to the end that said property may be exhibited, sold, prepared for shipment, and removed in an orderly manner within said ninety-day period." Plaintiff, vendee, agreed that the seller's property might remain on the premises during the ninety-day period as part of the consideration for the transaction and without cost or charge against the seller and that during that period the vendee would furnish without cost to the seller such facilities and utilities as were on the premises and "as reasonably may be required to accomplish the purposes mentioned."

We are of the opinion that under the above discussed provision of the contract of sale defendant was not "in possession" of any portion of plaintiff's plant, in either of the senses urged by the parties. At the beginning of the ninety-day period, the quitclaim deed to the premises had been delivered to plaintiff-vendee, and the purchase price paid in full. Therefore, pursuant to paragraph Six of the contract, the defendant, vendor, had only the right or privilege to enter the vendee's premises and do certain specified things in connection with personal property or chattels belonging to the vendor. What the vendor had was, in our opinion, a license coupled with an interest, that is, the privilege of using the vendee's land for a specified period of time with the privilege being incidental to the vendor's interest in certain chattels which it owned. Defendant could not have had a lease because a lease confers exclusive possession to the premises, or to some part thereof, against all including the owner. Seabloom v. Krier, 219 Minn. 362, 18 N.W.2d 88. Insofar as the premises conveyed were concerned, plaintiff-vendee had the right to possession of the entire premises and, in fact, was in possession as owner.[3] Defendant was a li-

---

sion or to the delivery of a deed. Among other things, the court held that in such circumstances the loss must fall on the vendor in possession. Plaintiff also refers to another line of cases holding that a seller who delivers land and improvements in a different condition from that in which it was agreed they would be conveyed, is liable to the buyer for the cost of remedying the defects so as to give the buyer property equivalent to that contracted for, not in excess of the purchase price.

3. During the period of time when defendant exercised its privilege to use the premises in connection with its personalty located therein, plaintiff carried on its plant reconversion program and was in all material respects in control of the entire plant.

censee of plaintiff through plaintiff's consent, expressed in paragraph Six of the contract of sale, granting defendant the privilege of entering a portion of plaintiff's building for certain limited purposes in connection with chattels therein belonging to defendant.

■ The rights and obligations of the parties to a license agreement depend upon the terms of, or the scope of, the consent which created it. In this connection the Restatement of the Law, Property, Vol. V, Servitudes, contains the following statement (§ 516, pp. 3128–29):

"*   *   * The privilege of use created [by the license] cannot go beyond the limits indicated by the consent by which it was created. The extent of the privilege is measured by the breadth of the consent. The breadth of the consent is determined, as in other cases of consensual transactions, by holding the licensor responsible to the extent to which he might reasonably have foreseen reliance upon an appearance of consent indicated by his conduct and by limiting the privilege of the licensee to such uses as are made in reasonable reliance upon an appearance of consent in the licensor. The consent of a licensor may be broader than he intended because, having appeared to intend more than he did, and having so acted that he should reasonably have foreseen the appearance resulting from his consent, he is deemed to have consented to the extent of the appearance he created. On the other hand, the consent of the licensor may be narrower than the licensee thought it to be because he was not reasonable in relying upon an appearance of consent broader than that intended. In such a case, the licensor is deemed to have consented only to the extent to which the licensee reasonably relied upon an appearance of consent."

In the instant case the extent of defendant's privilege can be determined to some extent from the provisions of paragraph Six of the contract of sale which constitutes the license agreement. That agreement, however, is silent on defendant's duty to repair floors that might be damaged as a result of defendant's use of that portion of the premises included in the license, and we must therefore examine the facts and circumstances surrounding the transaction to determine what the parties might reasonably have contemplated in that respect.

■ It is plaintiff's position that defendant is liable for any and all floor repairs made necessary by its removal work. We cannot agree with this contention. Because of the number, size, and concentration of the Government-owned machines in the areas covered by the license, and because of the manner in which many of them were installed, we think both parties must have known that inevitably a certain amount of damage would result to the wood block flooring as a result of the severance of the machines and their removal from the building. On the other hand, the contract expressly provided that the removal work would be done in an "orderly manner" and by that we think the parties intended not only that the removal work should be conducted in an expeditious manner by defendant and without interference by plaintiff so that it would be completed within the ninety-day period, but also that it should be done in a workmanlike and careful manner. Thus, while we think that an obligation on defendant's part for *all* repair costs cannot reasonably be implied from either the terms of the license or the circumstances surrounding it, we are of the opinion that defendant was obligated to use ordinary care in its use of the premises and, accordingly, that defendant would be responsible for the cost of damages to the floor which were in excess of what would have been normal had the work been done in an orderly and workmanlike manner.

Defendant contends that in the event it should be held liable for excessive dam-

age to the floors in plaintiff's plant, the record establishes that the removal work was carried out by its contractor with ordinary care and that the damage to the floors was not in excess of what might reasonably have been expected by the parties. Defendant also contends that plaintiff's contractor was working in that part of the plant during the floor removal work and contributed to the floor damage and interfered with the removal work of defendant's contractor.

■ The facts as found by the court do not support either of defendant's contentions, but on the contrary establish a lack of ordinary care in defendant's contractor, considerable unnecessary damage to the floors, and no interference with defendant's work on the part of plaintiff's contractor.

The interior of the plant consisted of 20 large bays running north and south, designated by letters from A to V, inclusive (excluding I and O), running from west to east. There were 13 high bays, i. e., A through J on the west, and S, T, U, and V on the east, each being 50 feet wide and having a 27-foot clearance. They were equipped with conductors for 10-ton cranes. There were 7 low bays in the central section of the building, K to R, 30 feet wide with a 15-foot clearance, and equipped with tramrails and hoists. The high bays were serviced by railroad spur lines, one on the east and one on the west side. The low bays were serviced by truck entrances at the north ends of the bays.

The manufacturing area of the building had an 8-inch thick reinforced concrete subfloor surfaced with 3-inch thick cedar blocks except for small areas along the railroad tracks and immediately under certain machines, which were placed directly upon and anchored to the concrete flooring. This area, except for the office space, was occupied to the greatest extent possible by machinery of various types and installed in different ways. Some of the machines weighed as much as from 45,000 to 50,000 pounds each and were placed directly on the concrete subflooring with wooden blocks set closely around the base of each machine. A few machines were mounted on cement pedestal foundations which were raised above the wood block floor. Most of the remaining machines were placed on square metal leveling blocks, one to each corner, resting in the wooden floor flush with the surrounding wood block floor surface. Each leveling block contained four bolts by means of which the machines were held in place. The machines were operated by electricity and the electric conduits ran from nearby pillars, under the wood flooring, to the base of each machine. Wherever possible these conduits had been placed so that they did not run under the main aisles.

Pursuant to an arrangement with defendant's Ordnance Department, plaintiff removed all the Government-owned machines from the east high bays, S, T, U and V, during the early part of the 90-day period. Plaintiff also purchased and removed some 40 Government machines located in the low bay areas during October and November 1946. The machines so removed by plaintiff were in general representative as to size and type of installation of the remaining 300 Government owned machines, ultimately removed by defendant's contractor.[4] Plaintiff's contractor carried out this removal work with rollers, cranes and trucks, and with the minimum amount of damage to the wood block flooring. In those instances where the machines were anchored in concrete foundations, plaintiff's contractor immediately filled in the resulting voids in the floor to provide a base over which other machines could be moved and to protect adjacent floor areas. Plaintiff's moving operations took place before the Government began its moving operations in December 1946, and served

4. Certain material differences as to number and concentration of machinery did exist between this area and the area in which defendant's contractor operated, and these factors will be discussed later.

to relieve the congestion of machines in the low bay areas. Plaintiff also removed Government-owned machinery from five sections of the southern part of Bays A and B, and some from part of Bay C, making the necessary repairs.

By the time defendant began its moving operations in December 1946, there remained some 300 Government-owned machines to be removed. These machines had to be moved out through exits at the north ends of Bays K and J, for loading on flatcars or trucks.

Defendant's contractor was inexperienced in performing the type of operation called for, and the methods employed were far from the best. In addition, the work was performed hastily, and to a large extent in a careless manner. The details of how the removal work was performed by defendant's contractor are set forth in findings 24 and 25. In general the excessive damage to the floor was caused by the fact that voids left by the removal of machines were not even temporarily filled. It was impossible to move out other machines without passing over these voids and in so doing the wood blocks surrounding the voids were torn up. Some machines were dragged over the floor without the benefit of rollers under the temporary wooden bases provided for shipping purposes. The anchor bolts which had held in place those machines resting on steel leveling plates, remained sticking up two or more inches after removal of the machines, and instead of cutting off the bolts at floor level, defendant's contractor removed the entire leveling plate leaving voids three inches in depth, in each instance. Electric conduits were literally pulled up out of the floor, tearing up or loosening the wood floor blocks on each side of the conduits.

The damage to the floors in the areas where defendant's contractor worked was greatly in excess of the damage reasonably to have been expected had proper methods been employed, and was also much greater than the damage resulting to the floors in the areas where plaintiff's contractor operated. However, the areas worked in by defendant's contractor contained a greater concentration of machines of all kinds and also more heavy machines than in the S, T, U, V area, where plaintiff's contractor did the moving. We have found that under all the circumstances it is reasonable to conclude that had defendant's removal operations been carried out in the same workmanlike manner as were plaintiff's in the east S, T, U, V area, the normal cost of repairing the floors in the west area would have been approximately three times the repair costs in the east area. Accordingly, any repairs in excess of an amount representing three times the cost of repairs in the S, T, U, V area, would be excessive.

We have found that the average cost per square foot of floor repairs in the S, T, U, and V area was $0.051, exclusive of the cost of new blocks used (finding 28). The normal cost of making repairs in the west bay areas would thus have been three times that amount or $0.153. There were approximately 202,050 square feet of wood block flooring in the area where defendant's contractor worked and, accordingly, the normal cost of repairs in that area would have been $30,913.65. Finding 31. The actual cost of repairs made necessary by defendant's removal operations was $47,349.47, exclusive of the cost of new wood blocks used, or $16,435.82 in excess of what it should have been.

We have also found that new wood blocks costing plaintiff $2,659.15 were required to repair the excessive damage caused by defendant's moving operations, making the total cost of the excessive damage in this area $19,094.97, which we hold plaintiff is entitled to recover.

Inasmuch as we have found that defendant's removal methods resulted in unnecessary and excessive damage to the floors, we discuss briefly defendant's contention that this claim is beyond the court's jurisdiction because it sounds in tort. While it is true that this court does not have jurisdiction over claims sounding primarily in tort, an action may

be maintained in this court which arises primarily from a contractual undertaking regardless of the fact that the loss resulted from the negligent manner in which defendant performed its contract. Chippewa Indians of Minnesota v. United States, 91 Ct.Cl. 97, 130, 131. A tortious breach of contract is not a tort independent of the contract so as to preclude an action under the Tucker Act. 28 U.S.C.A. §§ 1346, 2401, 2402. United States v. Huff, 5 Cir., 165 F.2d 720, 723. In the Huff case, the Government had leased lands occupied by others as grazing lands under leases. The Government desired the land for military purposes, and it was agreed that it would have the right to let down any wire on the then existing wire fences but that following the crossing of the fences by troops, the Government would re-staple the wire and leave the fences in as good condition and repair as they were at the time of entry on the premises by the Government. The Government failed to restaple the fences in a reasonable time and the grazing tenants were damaged. The court held that this failure of the Government was a tortious breach of contract but that such a breach was not a tort independent of the contract such as would preclude action under the Tucker Act. See also Keifer & Keifer v. Reconstruction Finance Corp., 306 U.S. 381, 59 S.Ct. 516, 83 L.Ed. 784.

In the case at bar the wrong actually derived from the Government's contractual undertaking to use ordinary care in removing its machinery from plaintiff's plant and was in no sense a tort independent of the contract. Accordingly, we hold that the defendant's claim on this point is without merit.

Claim for Maintenance and Utilities Costs During Period of Defendant's Removal Work Subsequent to December 10, 1946.

Plaintiff seeks reimbursement for maintenance and utilities costs averaging $12,372.58 per month for the period from December 10, 1946, through February 15, 1947, when the plant was finally cleared of all Government-owned machinery. Although plaintiff was obligated to and did furnish certain services to defendant free of charge during the 90-day contract period, it was under no obligation to supply such services following the expiration of the 90 days. We think that plaintiff is entitled to be paid the cost of any utilities and services incurred in connection with the area made unavailable to plaintiff after December 10, 1946, by reason of the presence therein of defendant's machines and the operations of its moving contractor.

The various items making up the total monthly cost of $12,372.58 to which plaintiff claims it is entitled, include, among others, metered power, gas, water, heating, supervision, and miscellaneous supplies. We have found that those specific items represent services and utilities required largely for plaintiff's own manufacturing operations which were going on in Bays S, T, U, and V, during the period in question. The average monthly cost of those items, including a 5% allowance for general administrative expense was $7,769.22, and we think that no part of that amount is fairly chargeable to defendant.

The remaining items, representing the cost of insurance, taxes, watchmen, maintenance and repairs, were applicable to the entire plant area, including the area in which the defendant's moving operations were going on. The average monthly cost of those items was $4,603.36, including a 5% allowance for general administrative expense.

The entire plant area was 313,460 square feet, of which 208,040 square feet, or 66 percent, of the entire plant was rendered unavailable to plaintiff by the presence therein of defendant's machines. Accordingly, plaintiff is entitled to be paid 66 percent of the cost of those items of service and utilities which were required for the entire plant (including the area in question), for the period during which plaintiff was deprived by defendant of the use of that area, that

is, for 67 days. The total amount of $6,785.09 is due plaintiff on this claim.[5]

### Claim for Expenses Incurred by Plaintiff in Moving Government-owned Machines.

By November 1946, it was apparent that under no circumstances could defendant move out all its machinery by December 10, as provided in the contract. This was so because of the number of machines to be moved, their size, the manner of installation, and the fact that at that time not a single machine had been moved by defendant and no arrangements for removal had been made. Commencing in November, and from time to time thereafter, in December 1946 and January 1947, plaintiff removed Government-owned machines from five sections of the southern part of Bays A and B and from part of Bay C, and placed these machines in the north portions of those bays. Plaintiff was then able to use the cleared area amounting to about 15,-000 square feet as storage space for steel needed in its plant-reconversion program. Some of this removal work was done by plaintiff's own employees but the record does not establish the amount of plaintiff's costs for the work of such employees. The record does establish that plaintiff paid its contractor $2,191.52 for the work the contractor did in connection with this removal.

Defendant concedes that if the above removal work was done by plaintiff after December 10, 1946, the Government is liable for the expense of such work, but urges that if the work was done prior to that date no such liability results since plaintiff had no right to touch the machines and in doing so was guilty of conversion under the principles of Landlord and Tenant Law. Furthermore, defendant contends that the removal was accomplished solely for plaintiff's benefit, was done without the permission of defendant, and cannot be said to have served to mitigate damages.

The record does not show precisely what portion of this removal work was completed prior to December 10, but it does establish that the bulk of it was done subsequent to that date. While there was not specific permission granted by defendant to plaintiff to do this work, defendant knew that it was being done and did not object. Unquestionably this work on plaintiff's part was of benefit to defendant because no excessive floor damage resulted, and defendant was able to move out the severed machinery more quickly than would have been possible if

5. Basis of allocation of items of expense claimed:

| Items of expense claimed | Normal maintenance costs for entire plant | Excluded as largely for pltf's mfg. |
|---|---|---|
| Supervision | | $1,750.50 |
| Chief guard and watchman | $2,174.33 | |
| Real estate taxes | 1,799.28 | |
| Insurance and fire protection | 124.32 | |
| Power | | 1,500.80 |
| Gas | | 18.38 |
| Water | | 113.16 |
| Fuel and firemen | | 3,965.30 |
| Maintenance and repairs | 286.22 | |
| Miscellaneous supplies | | 51.12 |
| Totals | 4,384.15 | 7,399.26 |
| General administration expense, 5 percent | 219.21 | 369.96 |
| | 4,603.36 | 7,769.22 |

$4,603.36 ÷ 30 = $153.44 per day × 66% is $101.27 × 67 days is $6,785.09.

it had remained installed in its original positions. We have already decided that the relationship of plaintiff and defendant was not that of landlord and tenant and, accordingly, that law is not applicable here.

We think that plaintiff is entitled to recover the amount proved to have been spent as expenses incurred in a reasonable effort to avoid the harm which both parties had reason to foresee would be the probable result of defendant's breach of the contract. As pointed out in § 335 of the Restatement of the Law, Contracts, plaintiff was under an obligation to avoid by a reasonable effort any damages which it should have foreseen and, having done so, it may recover as damages the expense incurred in such reasonable effort to avoid harm which the defendant had reason to foresee would be the probable result of its breach when the contract was made. It makes no difference whether the breach has already occurred, or where (as was the case of the work done prior to December 10) it is merely impending under circumstances such that it was not reasonable for plaintiff to expect defendant to prevent the harm. Both parties herein knew that defendant could not get the machinery out by December 10, because of the nature of the task and because defendant had not even started the removal work in November 1946. Defendant knew that time was an essential element of its license agreement and must have foreseen that plaintiff would be injured by its failure to have its machinery out of the plant by December 10. Under these circumstances, we hold that plaintiff is entitled to recover the $2,191.52 paid to its contractor for doing this removal work, in portions of Bays A, B, and C.

### Loss of Profitable Use.

Plaintiff contends that because of defendant's breach of its agreement to have all of its machinery out of plaintiff's plant by December 10, 1946, plaintiff was prevented from making profitable use of the floor space so occupied for the period of such delay subsequent to December 10, and is entitled to recover as damages the amount of such lost profits. Defendant contends that plaintiff may not recover for loss of profits because (1) such loss was not within the contemplation of the defendant when it made the contract; (2) the evidence supplies no basis for estimating the amount of such lost profits except in the most remote and conjectural sense; and (3) plaintiff was engaged in an entirely new business.

In order to recover lost profits as damages for breach of contract, it must first appear that such loss is the immediate and proximate result of the breach. It must also be established that loss of profits in the event of breach was within the contemplation of the contracting parties either (1) because the loss was natural and inevitable upon the breach so that the defaulting party may be presumed from all the circumstances to have foreseen it; or (2) if the breach resulted in lost profits because of some special circumstances, those circumstances must have been known to the defaulting party at the time the contract was entered into. Finally, there must be established a sufficient basis for estimating the amount of profits lost with reasonable certainty.

Much has been said in the cases about the uncertainty of anticipated profits lost as a measure of damages for breach of contract. The more recent and general view of the courts seems to be that if the fact of damage, that is, lost profits, is certain, uncertainty as to the precise amount lost is not necessarily fatal to recovery. Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544. In Penn Foundry & Manufacturing Co. v. United States, 75 F.Supp. 319, 110 Ct.Cl. 374, this court allowed plaintiff a sum representing anticipated profits lost through defendant's refusal to permit plaintiff to complete its contract with the United States. In reversing the judgment of this court, the Supreme Court, 337 U.S. 198, 69 S.Ct. 1009, 93 L.Ed. 1308, pointed out that the record and findings indicated that plaintiff company

was not actually in a position to complete the contract in any event because it lacked capital, know-how, and the necessary trained employees. Under such circumstances it would appear that the Government's breach was not the direct cause of plaintiff's failure to earn profits, and such uncertainty as to damage was held fatal to plaintiff's right to recover. In United States v. Purcell Envelope Co., 249 U.S. 313, 39 S.Ct. 300, 63 L.Ed. 620, the judgment of this court awarding as damages an amount for profits lost as a result of defendant's breach of contract, was affirmed on the ground that the record established that plaintiff could have performed the contract at all times in accordance with its terms and that loss of profits was the direct and immediate result of defendant's breach.[6]

Whether or not loss of profits on breach was within the contemplation of the parties at the time the contract was made, depends on the facts of each case. The Restatement of the Law, Contracts, states the following on the matter of foreseeability of harm as a requisite for recovery:

"§ 330.   *   *   *

"In awarding damages, compensation is given for only those injuries that the defendant had reason to foresee as a probable result of his breach when the contract was made. If the injury is one that follows the breach in the usual course of events, there is sufficient reason for the defendant to foresee it; otherwise, it must be shown that the defendant had reason to know the facts and to foresee the injury.[7] "

In Howard v. Stillwell & Bierce Manufacturing Co., 139 U.S. 199, 11 S.Ct. 500, 35 L.Ed. 147, the Court held that under the circumstances of that case loss of profits as a result of breach could not be said to have been within the contemplation of the parties because of the nature of the contract, nor were any special circumstances communicated to the defaulting party which could be said to have put it on notice. In a number of other cases, however, the courts have found that loss of profits resulting from breach was within the contemplation of the contracting parties and have allowed recovery of such profits as damages. Williams v. Island City Mercantile & Milling Co., 25 Or. 573, 37 P. 49; Bates Machine Co. v. Norton Iron Works, 113 Ky. 372, 68 S.W. 423; Dilley v. Ratcliff, 29 Tex.Civ.App. 545, 69 S.W. 237; Koehler & Co. v. York Mfg. Co., 2 Cir., 193 F. 981; Carroll Porter Boiler & Tank Co. v. Columbus Machine Co., 3 Cir., 55 F. 451.

On the question of the degree of certainty required to establish the amount of profits lost, the Restatement of the Law, Contracts, states in pertinent part as follows:

"§ 331.   *   *   *

"(1) Damages are recoverable for losses caused or for profits and other gains prevented by the breach only to the extent that the evidence affords a sufficient basis for estimating their amount in money with reasonable certainty.

"(2) Where the evidence does not afford a sufficient basis for a direct estimation of profits, but the breach is one that prevents the use and operation of property from which profits would have been made, damages may be measured by the rental value of the property or by interest on the value of the property.

*   *   *   *   *

"(d) If the defendant's breach has prevented the plaintiff from carrying on a well established business, the amount of profits thereby prevented is often capable of proof with reasonable certainty. On the basis of its past history, a reasonable prediction can be made as to its future."

See also Williston on Contracts, Rev'd Ed., Vol V, § 1346.

6. See 32 A.L.R. 120; 78 A.L.R. 858.

7. See also Williston on Contracts, Rev'd Ed., Vol. V, §§ 1344, 1344A, and 1345.

In general the courts have held that in the case of a new business there is no way, short of pure speculation, of determining what the plaintiff's profits would have been. Even in the case of an established business it is only possible to estimate the amount of profits that would have been earned if the contract in question had not been breached, but the courts will make that estimate if a reasonable basis therefor is provided. In the case of Rankin Co. v. Associated Bill Posters of United States, 2 Cir., 42 F.2d 152, plaintiff was permitted to show by the testimony of its treasurer, a compilation prepared on the basis of the business' net profits in one year, and the treasurer's knowledge of business conditions when the company was free from defendant's unlawful interference, what might have been the normal increase in plaintiff's business from year to year, and from all this to estimate plaintiff's probable yearly earnings for a four-year period. In holding such proof admissible, the Court of Appeals stated in part, 42 F.2d at page 155:

" * * * The fact that this amount of the plaintiff's damages could not be expressed in exact figures did not make them speculative. There was no speculation as to the fact of actual damage. Its [plaintiff's] business had been seriously curtailed. The defendants had caused the damage, and cannot be permitted to escape liability because it is difficult for the plaintiff to express in terms of dollars the damages it has suffered. This evidence, while purely an estimate and introduced as such, was proof of a kind as definite and certain as the subject-matter admitted. It had to do with what was never actually earned because of the defendants' wrongdoing. The witness testified from his knowledge of the business history, made his calculations upon what appears to be a reasonable basis, and the defendants had ample opportunity by cross-examination or the offer of their own evidence on the subject to discredit him and show any fallacy in his reasoning or testimony."

In Hedrick v. Perry, 10 Cir., 102 F.2d 802, Hedrick and Perry had been competitors for a number of years in the trucking business. In 1937, Perry entered into a contract with Hedrick, whereby Perry bought Hedrick's trucking business (which was larger than Perry's) and Hedrick agreed not to engage in the trucking business between certain named points for ten years, and also to use his best efforts to induce his customers to become Perry's customers. Hedrick breached his contract and commenced operating a new trucking business in the forbidden area, whereupon Perry sued to enjoin further breach and also for damages for past breach, alleging lost profits as damages. In allowing Perry to recover for loss of profits, the court stated in part, 102 F.2d at pages 806, 807:

"The award of damages is challenged on the ground that the damage alleged was remote, speculative, and contingent; that there was no tangible basis on which to predicate any loss; and that there was no competent evidence from which the court could find or ascertain the amount of the damages. The cause of action pleaded in respect to damages was loss of profits * * *. Anticipated profits from a business which is contemplated but not established are too remote and speculative to form the basis on which to recover damages for the reason that there are no facts from which the amount of such profits can be determined with the degree of certainty required by law. * * * But the business in question here was not merely contemplated. It was established, had existed for several years, and was reasonably stable in volume. It could not be reasonably expected that Perry would hold all of it, but in view of his experience and efficiency in the trucking business it was not too much for the court to

determine that he would have retained most of it if Hedrick had aided him and co-operated with him in the manner required by the contract."

Although Perry's business organization was much larger after the purchase of Hedrick's business than before, the court did not consider the enlarged enterprise a new one and it rendered judgment for anticipated profits which would have been earned by the enterprise after the sale, after making a reasonable allowance for the probable loss of some business which might have been expected even if Hedrick had not breached his contract.

In Gross v. Heckert, 120 Wis. 314, 97 N.W.952, defendant leased to plaintiff certain premises, knowing that plaintiff intended to use them as a saloon and to commence business immediately upon the beginning of the agreed lease term. When the lease was signed, defendant knew that he would be unable to deliver possession of the premises to plaintiff at the time promised, and in fact did not do so. In his suit, plaintiff asked for damages representing profits lost through his inability to occupy and use the premises as a saloon and, although plaintiff was new to the saloon business, he felt he should be able to rely on the profits made by the saloonkeeper then occupying the premises. The court held that while defendant was liable for all damages which could reasonably be considered to be natural and proximate result of defendant's breach, it was not certain that plaintiff would have earned any profits had the contract been carried out. Furthermore, the court pointed out that presumably the resident saloonkeeper would take with him some substantial portion of his good will when he moved and plaintiff's probable earnings in what for him was a new venture, were highly conjectural. Finally, the court noted that plaintiff had not shown that he was unable to rent other premises in the same locality which were equally as desirable for his business and at the same or a lower rent, making it even less clear that plaintiff's loss of profits was the proximate result of defendant's breach.[8]

The question whether or not plaintiff company herein would conduct a new or a well established business on the premises purchased from defendant, goes both to the matter of whether loss of profits may be said to be the proximate result of defendant's breach as well as to the problem of making a reasonable estimate of what those profits would have been. There also remains the question as to whether loss of profits from defendant's breach was sufficiently foreseeable by defendant when the contract was entered into. The plaintiff has established certain facts in the trial which we believe determine each of these issues favorably to plaintiff.

Plaintiff had been in the chain manufacturing business since 1891, and at the time of the purchase of defendant's plant was a well established going concern. Because of the strong post-war demand for plaintiff's chain products and a substantial backlog of orders, plaintiff decided to greatly expand its chain manufacturing business which was then being carried on at its Plant No. 1, located at 1600 West Bruce Street, Milwaukee. In order to implement the desired expansion, plaintiff needed additional floor space and it first planned to build a large new plant. Because of the time required for such a program, and because defendant's plant was of the necessary size; was designed so that all manufacturing operations could be carried on on one floor; was desirably located; in good condition and immediately available, plaintiff decided to negotiate for the purchase of that plant into which it would then move all its chain manufacturing operations. Although the business was to be conducted at a new site and was to be on a much larger scale than formerly, we are of the opinion

8. See 46 Harvard Law Review, 696; 104 A.L.R. 132.

that these considerations did not render plaintiff's proposed operations a new business. Hedrick v. Perry, 10 Cir., 102 F.2d 802.

▮ On the question of foreseeability, it appears that defendant was well aware of plaintiff's circumstances and plans. Plaintiff paid cash for the plant almost immediately following the signing of the contract of sale and when defendant agreed to remove its machinery from the large floor area it occupied within 90 days, it knew that plaintiff wished to make immediate use of that area for the purpose of carrying on a profitable business. We think that loss of profits upon defendant's breach of its agreement to vacate the floor area within 90 days, was clearly within the contemplation of the parties when the contract was negotiated.

▮ At the time of the negotiations for the purchase of defendant's building and during all the period in suit, there was no equivalent suitable space available for plaintiff's expanded business in the Milwaukee area, either to rent or to purchase. Even if such space had been available for rent, it would have been impractical for plaintiff to have acquired such space on a temporary basis since major installations, involving great expense, would have been required to make such space suitable for plaintiff's particular manufacturing operations. Accordingly, the rental value of the manufacturing area made unavailable to plaintiff through defendant's breach is not under the facts of this case, a proper measure of plaintiff's damages.

Plaintiff showed that during the year ending October 1946, its backlog of orders had increased from approximately $9,000,000 to over $20,000,000, for all of its divisions. Its backlog for the chain belt and transmission division had increased approximately 72 percent to over $6,000,000. By the end of 1947, plaintiff's backlog of orders for all divisions totaled approximately $10,500,000, although such orders for the chain belt and transmission division remained fairly constant and were slightly higher in December 1947.

During 1947, plaintiff received substantial cancellations of orders in all divisions. Because of its inability to meet delivery schedules in connection with its chain belt orders, plaintiff's new orders were restricted and some cancellations resulted. In our opinion it is reasonable to conclude from the evidence of record, and we have so found, that the additional capacity of plaintiff's new plant would have resulted in increased earnings approximately equivalent to the earnings realized by plaintiff from its other manufacturing facilities.

▮ It is also established by the record that plaintiff was fully ready and able to proceed immediately with its reconversion work in the new plant on or before December 10, 1946. While the record is not detailed on this point, there is unrefuted evidence from which it is reasonable to conclude that plaintiff had on hand the necessary capital, new machinery, and trained labor, to enable it to proceed at once with its conversion plans and with its manufacturing operations. The only thing that prevented plaintiff from going ahead on December 10, 1946, was the presence of defendant's machinery in a substantial portion of its new plant. It, therefore, appears that loss of profits was the direct and proximate result of defendant's delay in removing its machinery from the plant.

▮ There remains for consideration the question of whether plaintiff has furnished a reasonable and acceptable method of estimating, with reasonable certainty, the amount of profits it would have earned but for defendant's breach of its agreement to vacate the plant by December 10, 1946.

Plaintiff introduced evidence of its sales for the ten-year period from 1936 through 1945, from its Milwaukee and West Milwaukee plants, exclusive of its gun manufacturing operations for the Government during the war years. These sales totaled $99,967,600, on which plaintiff realized a net profit of approxi-

mately $17,838,600, or a profit ratio on sales of approximately 17.8 percent. Its sales from the chain belt and transmission division of its business during this period were approximately $40,155,100, or 40 percent of its total sales, with a net operating profit ratio of approximately 21 percent on such sales.

During plaintiff's 1947 fiscal year, its total sales were $18,500,113, with a net profit ratio of 15.8 percent, and for the fiscal year 1948, its total sales were $21,369,977, with a net profit ratio of 16.5 percent.

During the period from December 1946 through April 1947, plaintiff's total sales from its Milwaukee and West Milwaukee plants were $7,478,915.60, upon which it realized a net operating profit of $1,062,859.25, or a net profit ratio of 14.2 percent.

The total productive floor area of plaintiff's plants was 597,645 square feet. Because of the nature of plaintiff's manufacturing operations, its earning capacity bore a substantial relation to its available manufacturing floor space. Accordingly, the productive factory area is a fair and reasonable measure of attainable profits from plaintiff's business during the period it was denied the use of manufacturing floor space in the new plant, acquired for this purpose. Plaintiff's net profit per square foot of manufacturing floor space, a calendar day, from December 1946 through April 1947, was equivalent to $0.0118. Plaintiff's profit ratio on the products of its chain belt division was at least as large as the average on all its sales.

Since we have found that plaintiff's business operations earned a net profit of approximately $0.0118 per square foot, a calendar day, during the period from December 1946 through April 1947, while defendant was conducting its moving operations and plaintiff was engaged in making the necessary repairs to the floors damaged by those operations, there remains to be determined the area rendered unavailable to plaintiff by defendant and the period during which it was thus unavailable.

We have found (finding 49) that the last Government-owned machine was out of the plant by the close of business on February 15, 1947, and on that date plaintiff had the same use of the plant it would have had if defendant had vacated by December 10, 1946, as agreed. Plaintiff was thus held up for a period of 67 days. Defendant took the position that certain areas of floor space became available to plaintiff from day to day, after December 10, 1946, as Government-owned machinery was gradually moved out. A daily record of diminishing floor space, remaining to be cleared, was kept by the parties during the removal work. However, the areas so cleared were not contiguous but were scattered at random over larger areas of the plant, and plaintiff was not able to use them. Also, all machines had to be carried out through the north ends of Bays J and K, and some of the machines in Bay J, which was approximately in the middle of the plant, were the last to be removed. Because of the large number of machines, the manner in which they were removed with the resulting excessive damage to large areas of flooring, it was not until all the machines were out, and some of the floor damage repaired, that any of this space was available to plaintiff for its use. On the other hand, we are not justified in holding that this area was unavailable to plaintiff until April 19, 1947, when all the floor repairs and restoration was completed, since this work went on concurrently with the Government's removal operations and also with plaintiff's normal repair and reconversion program. We, accordingly, hold that plaintiff's property was unavailable to it, because of defendant's breach, from December 10, 1946, through February 15, 1947, and plaintiff was thus delayed for a period of 67 days in obtaining the full earning capacity of its plant.

The total productive floor space in the new building, denied to plaintiff for the

67 days, consisted of 208,040 square feet. However, plaintiff's old chain belt plant was still in operation and contained 91,974 square feet of manufacturing floor space so that plaintiff's actual loss of productive earning space during that period was only 116,066 square feet.

On the basis of all the evidence in the record, we think it is reasonable to conclude, and we have found as a fact, that plaintiff lost $91,761.78 in profits during the 67 days it was delayed by defendant from having the use of the 116,066 square feet of plant, figured on the basis of $0.0118 per square foot as profit for each calendar day of delay.

Plaintiff's total damages, resulting directly from defendant's breach of its agreement to remove its machinery from plaintiff's plant in 90 days and in an orderly manner, total $119,833.36,[9] and judgment will be entered in favor of plaintiff for that amount.

It is so ordered.

HOWELL and MADDEN, Judges, concur.

JONES, Chief Judge (dissenting in part).

I agree with the opinion and conclusions of the majority, except for the item of lost profits.

In all the circumstances of this case I do not believe that lost profits during a post-war period for a building originally constructed for war purposes are sufficiently established by a showing of profits which plaintiff made during the same post-war period in buildings which it had constructed for and which for a long time it had operated in its regular business.

Instead of lost profits, which are to some degree necessarily speculative, I would allow plaintiff the reasonable rental value of the average space occupied by the defendant, as found by the trial commissioner, for the 67-day period of excess occupancy, to wit, $11,610.

I agree to the other items as set out in the opinion of the court.

WHITAKER, Judge, joins in this dissent.

9. Total damages:
Cost of repairing excess damage to wood flooring (Finding 31)__ $19,094.97
Cost of protection and maintenance for 67 days (Finding 32)____ 6,785.09
Cost of moving some government-owned machines (Finding 33) __ 2,191.52
Loss of profits for 67 days (Finding 42)_____ 91,761.78