**F. S. NEELY**
**v.**
**UNITED STATES.**
**No. 374-56.**

United States Court of Claims.
Jan. 18, 1961.
As Amended Jan. 26, 1961.

C. R. Warner, Jr., Fort Smith, Ark., for plaintiff. Paul H. Jenree, Kansas City, Kan., Heartsill Ragon, Fort Smith, Ark., and James B. Sharp, Brinkley, Ark., were on the briefs.

Walter H. Williams, Washington, D. C., with whom was Asst. Atty. Gen. Perry W. Morton, for defendant.

WHITAKER, Judge.

Plaintiff sues for breach of its contract of lease to mine coal on some 2,000 acres of coal-bearing lands in eastern Oklahoma.

In the latter part of 1948, or the early part of 1949, the Choctaw and Chickasaw Nations transferred the lands to the United States. Following the transfer, the Lone Star Steel Company made application for a mining lease on the lands, in a letter to J. D. Turner, the district mining supervisor of the Geological Survey, at McAlester, Oklahoma. Mr. Turner recommended to his superiors in Washington that the land be offered for lease. In April and May, 1950, the land was publicly advertised for leasing for the mining of coal. The advertisement stated in part:

"A lease, if issued, will contain * * * substantially the * * * terms set out in the standard coal lease Form 4–696."

Four bids were submitted as follows:

F. S. Neely . . . . . . . . . . . . . . . $2.88 per acre
Coaldale Mining Company . . 1.03 " "
Lone Star Steel Company . . . . 1.05 " "
S. E. Evans . . . . . . . . . . . . . . . 1.00 " "

On May 25, 1950, the Director of the Bureau of Land Management informed plaintiff that his bid was accepted "subject to approval of your qualifications and compliance with any requirements which may be made in connection with the issuance of a lease. You will be promptly informed of such requirements, and lease and bond forms will be forwarded for your execution". The lease, on standard form 4–696, was executed on September 1, 1950.

Neely planned to mine the coal by the strip-mining method. However, as soon as J. D. Turner learned that plaintiff's bid had been accepted, he called plaintiff's office on the telephone and advised plaintiff's office manager that he would not be allowed to strip-mine the leased lands. Prior to this, plaintiff had not notified the lessor of the method he proposed to follow in mining the coal, but in 1947 and 1948, when the lands belonged to the Choctaw and Chickasaw Nations, plaintiff had conferred with J. D.

Turner relative to obtaining a lease on the lands and had informed him that he intended to strip-mine the coal. He was then advised by Mr. Turner that he would not recommend a lease which would permit strip-mining.

Not only did Mr. Turner call plaintiff's office to advise him that strip-mining would not be permitted, but a few days later, having encountered plaintiff on a highway in Arkansas, he stopped him for the purpose of informing him in person that he would not be permitted to strip-mine the lands. He followed this five days later with a letter to plaintiff, which he sent by registered mail, again notifying him that he would not be permitted to strip-mine the lands.

Plaintiff made diligent effort to have this prohibition countermanded, both by appeals to Mr. Turner himself and by appealing to Mr. Turner's superiors in the Bureau of Land Management in Washington, and also by appeal to the Secretary, through Senator McClellan of

Arkansas, but he was unsuccessful in doing so.

Since strip-mining was the only method which plaintiff thought he could profitably pursue, he assigned the lease to the Core Mining Company and withdrew from the enterprise.

He alleges that the refusal of the Department of the Interior to permit him to strip-mine the lands was a breach of his lease, that he suffered large damages as a result of the breach, and for them he sues.

The lease did not prescribe the method to be pursued in the mining operations. The only provision relative thereto is the following which appears in section 4(a):

"The lessee shall carry out and observe regulations prescribed by the Secretary of the Interior and in force at the date hereof relative to (1) reasonable diligence, skill, and care in the operation of said property in accordance with approved methods and practices * * *."

One of the methods for mining coal which was approved by the coal mining regulations of the Department of the Interior, was strip-mining, but this was permissible only on certain conditions. Section 30 of the "Operating Regulations" is headed, "Mining by Stripping." Section 30(a), which is section 211.27 of Title 30 CFR, reads:

"Sec. 30(a). No strip pit will be permitted on the outcrop of any dipping coal bed until the workable coal at lower altitude in that bed and underlying beds has been extracted, unless there is free natural or artificial drainage from the pit that will prevent seepage underground down the dip."

It will be noted that the only condition imposed on strip-mining was that such drainage be provided as would prevent seepage underground; but J. D. Turner did not issue his prohibition against strip-mining on the ground that seepage underground could not be prevented. This was not mentioned by him. He issued it on a ground not mentioned in the regulations. He stated in his testimony that he prohibited it because, "It was never contemplated in the first place. It wasn't offered that way", and also because, "the lease did not authorize stripping * * *."

What may have been in the minds of the defendant's officials when they offered to lease the lands can have no effect on plaintiff's rights. The contract of lease determines those rights. The lease called for "operation of said property in accordance with approved methods and practices." Strip-mining was a method approved by the regulations, on the condition stated above.

After plaintiff's attorney had made an unsuccessful attempt to get Mr. Turner to change his mind, plaintiff wrote the Bureau of Land Management outlining his plan for mining the coal. He stated that he intended to strip the—

"* * * coal crop line for a length of about one-half mile in approximately the center of said lands. * * * There will be free natural or artificial drainage from the strip pit which I propose to open and operate on the leased premises, which will prevent seepage underground down the dip.

"(2) After stripping the one-half mile of crop line as specified above, it is my plan to open an underground slope at a point approximately the center thereof, and then proceed with underground mining operations.

"In the conference with Mr. Turner he stated that no stripping would be allowed on said leased premises. It is my position that the lease and the Operating Regulations, copy of which you sent to me, expressly authorize the stripping operation proposed. There is nothing in the notice which was published by you offering said premises for coal mining lease, or in the lease made to me, which purports in any way to prohibit the mining of coal by stripping

method so long as said Operating Regulations governing coal mining methods are not violated. These Regulations do not prohibit stripping when there is free natural or artificial drainage which will prevent seepage underground down the dip. The stripping plan proposed is within this regulation and will not violate the same."

The Bureau of Land Management referred plaintiff's letter to the Geological Survey.

J. D. Turner made several reports to the Geological Survey, one, on his interview with plaintiff's attorney, one, on his conversation with plaintiff in the 1940's on the possibility of leasing the lands, and on January 24, 1951 he reported in part as follows:

"The northeast crop line, dipping southeast onto the leased land, has been exploited by many small mines (pigeon holes locally) which extend from opposite the west boundary to more than two miles north of the leased land. No substantial barrier pillars or slope pillars were left in connection with the above mines. Therefore, egress or ingress to the west or north part of the leased land along the coal seam is impractical. Furthermore, the old workings referred to are flooded.

"Consequently from the information available the leased land can be developed by a slope mine from the south crop line in section 11 (the area Neely proposes to strip). Otherwise the large area of apparently minable [sic] coal would be rendered inaccessible except by two shafts located near the center of the property which would be very expensive.

"The above in effect is similar to the reasons I gave Neely why I would not recommend stripping in this case."

It will be noted nothing was said about the impossibility of providing proper drainage, which is the only reason prescribed by the Regulations for prohibiting strip-mining.

Furthermore, Mr. Turner's report did not state the facts in two respects; at least, it is in conflict with his testimony on the trial of the case.

In the first place, in his conversations with plaintiff, he did not assign the reasons given in his report for refusing to permit strip-mining. In his testimony he says stripping was prohibited because it was not contemplated when the land was advertised for lease, and the lease did not provide for it.

In the second place, he admitted in his testimony that the underground coal could be recovered by slope-mining if a "plug", or unstripped place, was left. He said this was common practice in the locality, and was being practiced on leases supervised by him, both before and after the lease to plaintiff. He further said more than one plug could have been left on the lands in question. This is an admission contrary to the statement in his report that stripping prevented slope-mining and necessitated the sinking of expensive shafts near the center of the property.

After receipt of these reports, the Acting Director of the Geological Survey wrote plaintiff confirming the prohibition against strip-mining, assigning as reasons: first, that the lease did not permit strip-mining; second, that the local office had advised plaintiff two or three years before that stripping would not be permitted; and, third, that it would not be conducive to maximum recovery of the coal at the lower level. The latter reason seems to have been based on the erroneous statement in J. D. Turner's report that two shafts near the center of the property would be necessary to recover the underlying coal.

Again, it will be noted, that no reference was made to inadequate drainage.

Plaintiff replied that stripping was permitted under the regulations if proper drainage was provided, and that he proposed to provide such drainage, that he assumed his rights were governed by the law and regulations and the terms of the lease, and not by the unauthorized statement of some employee of the De-

partment, and in conclusion he reiterated that he intended to "establish and maintain satisfactory drainage as provided by the regulations".

Plaintiff again two months later wrote the Acting Director and also enlisted the aid of Senator John L. McClellan of Arkansas to secure a lifting of the restriction, but to no avail. On May 2, 1951, the Acting Director wrote plaintiff, reiterating his denial of permission for strip-mining. For the first time in the year since plaintiff's bid was accepted, the matter of drainage was mentioned. The letter stated in part:

"After further review and investigation of drainage conditions incident to the proposed strip-mining operation, the Survey is still of the opinion that strip-mining of the coal deposits under consideration, would jeopardize future underground mining operations and be detrimental to the Government's interest."

No opportunity was afforded plaintiff to outline his method of providing drainage or to show that it was adequate to protect the underlying coal. Defendant's witnesses admitted that it was possible to provide adequate drainage. Anyway, it is apparent that the drainage objection was an afterthought, brought forward, after intervention by a United States Senator, to justify their former action.

The only condition imposed by the regulations on strip-mining was the provision for proper drainage to protect underlying coal. If this was provided, stripping was permitted. Defendant's prohibition of it for any other reason was unjustified by the regulations. The statutes and the regulations govern plaintiff's rights, since the lease referred only to "approved methods and practices."

Defendant's alleged reason for the prohibition, that strip-mining would prevent recovery of the underlying coal, was proven at the trial of the case to be unjustified. Defendant's agent, Turner, must have known it was unjustified, because stripping was being followed on other leases supervised by him without hindrance to the recovery of the underlying coal, through the medium of leaving plugs for slope-mining.

Strip-mining was prohibited by defendant's agents before plaintiff was given any opportunity to put forward his plan of operation and to show that he was in position to comply with the regulations relative to drainage, and would do so. We are of opinion the prohibition was unjustified and constituted a breach of the contract of lease.

One further thing should be mentioned in support of this conclusion. When plaintiff could not persuade the officials in the Department to permit strip-mining, he assigned his lease to the Core Mining Company. That company made explorations that demonstrated, to its satisfaction at least that the underlying coal could not be mined economically and, since it was not interested in strip-mining, it reassigned the lease to the Ouachita Coal Company. After this company had made some further explorations, it proposed to strip-mine for coal, and permission to do so was given. This was under the same lease given, in the first instance, to plaintiff and assigned by him. Whether the mining supervisor had become convinced that the underlying coal could not be mined profitably, we do not know.

It should also be stated that the strip-mining being carried on on other lands in the locality was also under the standard coal lease Form 4–696, which was used in the lease to plaintiff.

We think it clear that the prohibition of strip-mining was a breach of the contract of lease.

The Trial Commissioner did not express an opinion on whether there had been a breach of the lease contract, since he was of opinion plaintiff was barred from recovery for failure to exhaust his administrative remedy. We regret to disagree with the Commissioner, but we think plaintiff did substantially exhaust his administrative remedy.

■ ■ Unless made a prerequisite to suit by statute, binding regulation or contract, the extent to which a plaintiff is required to pursue his administrative remedy is a matter for the discretion of the court. United States v. Abilene & Southern Ry. Co., 265 U.S. 274, 44 S.Ct. 565, 68 L.Ed. 1016; Cuiffo v. United States, 131 Ct.Cl. 60, and other cases cited therein. The Trial Commissioner thought plaintiff's failure to appeal to the Secretary of the Interior prevented his resort to the court. We do not think so, since Senator McClellan brought the matter to the attention of the Secretary, as evidenced by the acknowledgment of his letter, together with the file enclosed, by an Assistant Secretary, and the statement that further investigation was being undertaken. We think this was substantial compliance with the last step in the exhaustion of plaintiff's administrative remedy. The statute did not require plaintiff to pursue any prescribed administrative remedy as a prerequisite to suit.

■ This leaves the question of damages. The Trial Commissioner finds that the market value of plaintiff's lease was $22,000, which was the commuted value of what plaintiff sold it for; but plaintiff might have been able to secure a higher price for it, if the prohibition against strip-mining had not been imposed. We do not think plaintiff's damages are limited to this amount.

■ Plaintiff asks for loss of his anticipated profits. This is a recognized measure of damages, where their loss is the proximate result of the breach and the fact that there would have been a profit is definitely established, and there is some basis on which a reasonable estimate of the amount of the profit can be made. But profits are uncertain; they depend on so many contingencies, especially in a new enterprise, that it is, in most cases, impossible to say that the breach was the proximate cause of the loss of them, or that a profit would

have been realized, in any event; nor is there any basis to determine what they might have amounted to. This is especially true where the breach occurred before operations had begun.

This question is carefully and fully considered in an opinion written for the court by Judge Littleton in the case of Chain Belt Co. v. United States, 115 F. Supp. 701, 127 Ct.Cl. 38. We shall not repeat what we said there. Suffice it to say that almost always, in the case of a new venture, the fact that there would have been a profit, had there been no breach, is too shrouded in uncertainty for loss of anticipated profits to form a reliable measure of the damages suffered.

■ In this case, however, some four or five years after the breach, the leased lands were actually strip-mined and 132,000 tons of coal were extracted. Operations were carried on for a year or two and then ceased, due to the discovery of a fault in the seam of coal that made further operations impractical. This operation was under an assignment of the lease issued to plaintiff. The equipment used was not the same as that plaintiff proposed to use, and plaintiff claims it was inferior to his. On the other hand, no plugs, barriers, nor pillars were left and no drainage was provided, some or all of which plaintiff would have had to provide. Nevertheless, the profit realized from these operations, if, indeed, there were profits, would furnish some basis for a fairly reliable estimate of what plaintiff's profits would have been. Unfortunately, however, no proof was introduced to show whether or not a profit was realized from these operations and, if so, how much.

Since this seems to us the best available proof on which to base an estimate of plaintiff's loss,[1] the case is remanded to Trial Commissioner White to take proof on the financial return from this operation; also on comparative costs of operation then and in 1950 and 1951 and with the equipment used and that plain-

---

1. We do not regard proof of what was realized on some other operation some miles removed from plaintiff's lease as reliable.

tiff intended to use; whether plaintiff would have been able to extract more or less coal with the equipment he intended to use; the cost of providing drainage, and of leaving such plugs, barriers and pillars as were necessary at the time plaintiff intended to operate; and other relevant factors; and to report thereon, with his estimate of what plaintiff's profits might reasonably have been expected to be. If the parties are able to agree on this amount without the taking of proof, he will so report, giving the amount agreed upon.

Plaintiff is entitled to recover and judgment will be entered to that effect, but the amount of the judgment is reserved until the incoming of this report.

It is so ordered.

JONES, Chief Judge, and DURFEE, LARAMORE and MADDEN, Judges, concur.