**ALEUTCO CORPORATION**

v.

**UNITED STATES of America,**
**Appellant.**

No. 12039.

United States Court of Appeals
Third Circuit.

Argued Jan. 11, 1957.

Decided May 8, 1957.

Morton Hollander, Washington, D. C., (George Cochran Doub, Asst. Atty. Gen., Leonard G. Hagner, U. S. Atty., Wilmington, Del., Paul A. Sweeney, Dept. of Justice., Washington, D. C., on the brief), for the United States.

Richard F. Corroon, Wilmington, Del., (Berl Potter & Anderson, Wilmington, Del., on the brief), for appellee.

Before GOODRICH, KALODNER and HASTIE, Circuit Judges.

KALODNER, Circuit Judge.

In an action against the United States under the Federal Tort Claims Act,[1] in the District of Delaware, Aleutco Corporation ("Aleutco") sought damages for conversion of certain war surplus property which it had purchased from the Government. Judgment of $68,127.50 was awarded to it and this appeal followed, presenting these contentions by the United States:

(1) Aleutco's claim is founded on contract since it had its inception in a contract of purchase for the war surplus property and such a claim is not actionable under the Federal Tort Claims Act because the latter relates exclusively to tort claims;

(2) The amount involved exceeds $10,000 and accordingly the Court of Claims, under the terms of the Tucker Act, has exclusive jurisdiction;[2]

(3) Assuming jurisdiction under the Federal Torts Claims Act its two-year limitation period barred Aleutco's action;

(4) There was no conversion because the property had reverted to the United States under the terms of the contract;

(5) The damages awarded rested on inadequate testimony and were excessive.

The facts as found by the District Court,[3] and disclosed by the record, may be summarized as follows:

In May, 1948, Aleutco purchased from the War Assets Administration, for $868,000, miscellaneous surplus war property located in the Aleutian Islands, Alaska, in the custody of the Navy. The contract of sale required removal of the property by November 30, 1948, and gave the Government the right, upon fifteen days written notice, to treat the property as abandoned if not removed by that time.[4] The November 30, 1948 re-

---

1. 28 U.S.C. § 1346(b).

2. 28 U.S.C. § 1491(4) provides in part:
   28 U.S.C. "§ 1491. Claims against United States generally
   "The Court of Claims shall have jurisdiction to render judgment upon any claim against the United States:
   \* \* \* \* \*
   "(4) Founded upon any express or implied contract with the United States;
   \* \* \*"
   28 U.S.C. § 1346(a) (2) provides in part:
   28 U.S.C. "§ 1346. United States as defendant
   "(a) The district courts shall have original jurisdiction, concurrent with the Court of Claims, of:
   \* \* \* \* \*
   "(2) Any other civil action or claim against the United States, *not exceeding $10,000 in amount*, founded \* \* \* upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." (Emphasis supplied.)

3. The opinion of the District Court is not reported.

4. Paragraphs 3 and 5 of the contract of sale provided:
   "3. All expenses of preparation for shipment, loading, transportation, and other expenses incident to removal of the property shall be borne by the Purchaser. The Purchaser shall remove the property covered by this Agreement from its present location not later than November 30, 1948, subject to such an extension as the War Assets Administrator or his authorized representative, in his sole discretion, may grant."
   "5. Except as provided in paragraph 4 hereof the risk of loss, damage, destruction, deterioration or depreciation of the property shall be upon the Purchaser, effective upon the date of this Agreement. It is anticipated that the Seller will exercise its usual care and custody of the

moval date was later extended by mutual agreement to October 30, 1949.

The surplus property purchased by Aleutco consisted of approximately twenty boatloads of miscellaneous equipment and materiel. Eighteen boatloads were removed by Aleutco in the summer of 1948. Two additional boatloads of goods remained at Dutch Harbor in the Aleutians, one of which was removed by Aleutco in the summer of 1949.

On August 2, 1949, the General Services Administration, successor to the War Assets Administration, wrote to Aleutco acknowledging its payment of the balance of the $868,000 purchase price due under the contract and releasing it from the provisions of the credit and warehouse agreements between it and the Government.

On March 14, 1951 Aleutco (through its counsel) wrote to the Navy requesting permission to send a vessel to Dutch Harbor for the purpose of removing the balance of the property purchased under its contract. The permission sought was granted by the Navy on March 22, 1951. Pursuant thereto, Scott C. Kellogg and Bill Green, two Aleutco officials went to Kodiak in the Aleutians to arrange for the shipment. They there conferred with Coy E. Stockard, a civilian employee of the Navy, whose duties "embodied administration of disposal of surplus property". Stockard refused permission to the Aleutco representatives to remove any property from Dutch Harbor because "he did not know of any property that belonged to the Aleutco Corporation"; because they had not produced "evidence of ownership of this property"; and "that after a period of 21 months with the material and equipment left there without some arrangement for custody that I would consider the property had been abandoned."

The matter was then referred to the Navy Department in Washington for determination as to the ownership of the disputed property. Shortly thereafter, May 9, 1951, Aleutco's counsel wrote to the General Services Administration, Washington, stating that the War Assets Administration had earlier advised Aleutco that "there was no urgency for the removal of the property so long as it was kept out of any areas needed by either the Army or the Navy" and that "Specific written permission was granted by the Commander of the Naval operating base at Adak, Alaska, for an indefinite extension of time for removal of the surplus materials remaining at Dutch Harbor." On June 15, 1951, the General Services Administration wrote to Aleutco's counsel stating that the Navy Department "has been advised that it is the position of this Administration that ownership of the property covered by the sale and actually delivered in accordance with the terms thereof passed to the Aleutco Corporation as of the date of execution of the

property covered by this Agreement until removal by the Purchaser. In the event the Purchaser fails to make payment or complete satisfactory credit arrangements pursuant to the conditions of paragraph 1–b, or fails to remove the property by November 30, 1948, the Purchaser shall upon demand pay to Seller reasonable storage charges or Seller may transport and store the property elsewhere for the account and at the expense of the Purchaser; or, at the option of the Seller and upon 15 days written notice to the Purchaser mailed to its last known address the property may be treated as abandoned by the Purchaser and disposed of in such manner as the custodial agency and Seller determine without liability on the part of the Seller

and without any adjustment in the purchase price. Provided, however, that such action will be delayed to agree with any extension of the removal date agreed upon in accordance with paragraph 3 hereof. Seller may also, upon such failure to remove the property, or in the event of default of the Purchaser in making payment rescind the sale, or sell the property at the risk of the Purchaser upon such terms and conditions as it deems proper, and Purchaser shall upon demand pay to Seller the amount of all losses and expenses incurred by reason of such failure or default. The exercise by Seller of one or more of the rights herein specified will not preclude Seller from exercising any other rights it may have against the Purchaser."

sales agreement * * * and that any arrangement which may have been made between the Aleutco Corporation and the Navy Department under which the property here involved was allowed to remain on the Aleutian Islands is a matter entirely between the Navy Department and the Aleutco Corporation, whose respective rights concerning ownership of the property would be for determination under applicable law and not for determination under the terms of the contract covering the purchase of the property by Aleutco Corporation from the United States."

On September 7, 1951, following correspondence and conferences between Aleutco and representatives of Rear Admiral Sprague, Commander, Alaskan Sea Frontier, the latter wrote Aleutco, stating in part:

" * * * The District Public Works Officer of this Command has reviewed all available information in an attempt to determine if any Corporation owned material and equipment remain at Dutch Harbor.

"This review is premised upon the understanding that any items of material or equipment which can be identified as having been included and offered on War Assets Administration Special Offering, Circular 96, remain the property of Aleutco Corporation * * *

"The completion of a review of the files does not support a claim that there is a remainder in the ownership of the Corporation. Permission for removal would, therefore, not be warranted * * *

"As a preliminary to continued negotiation, however, it is suggested that the Corporation submit a list, together with the description and numbers identical with that shown on the Sales Documents, of all items for which claim and permission to remove is made. Or, that representatives of the Corporation personally present supporting data on acceptance and removal of items as well as information from any source having a bearing on this transaction, to the Commander, Alaskan Sea Frontier, sufficient to justify further action by this Command.

"Upon receipt of conclusive evidence that property of the Aleutco Corporation remains at Dutch Harbor, this Command will arrange for a Naval inventory team to visit the area, along with representatives of the Aleutco Corporation, for the purpose of final determination of ownership and recommended action as to the removal of those items so identified."

On November 19, 1951, Aleutco's attorney wrote the Commander that an appropriate identification of the property would be prepared. It was also suggested that it would be desirable to have representatives of both parties visit Dutch Harbor for the purpose of final identification. On July 8, 1952, Aleutco's attorney requested advice as to the earliest convenient date for a conference concerning Aleutco's property. On July 11, 1952, the Commander replied stating that in view of Aleutco's failure to furnish the requested information, it had "forfeited any rights it might have once had to any property at Dutch Harbor." On that same day the Navy shipped the property from Dutch Harbor to Oakland, California where it was sold to a Chicago firm.

Aleutco filed suit on February 24, 1954, alleging in its complaint that the action was brought under the Federal Tort Claims Act, and that the shipping of the goods from Dutch Harbor and the sale to the Chicago firm "constituted a wrongful conversion of plaintiff's property."

After trial, the District Court ruled *inter alia*: (1) the Federal Tort Claims Act vested it with jurisdiction; (2) no act of conversion occurred prior to July, 1952, so that the action was not barred by the statute of limitations prescribed in 28 U.S.C. § 2401(b); (3) paragraph 5 of the contract of sale was not effective to revest the property in the Govern-

ment; (4) Aleutco had proven the value of the goods at the time of the conversion to be $68,127.50.

The Government bases its appeal on these four findings and contends that each of them was error.

### I. Jurisdiction

■ The act creating the Court of Claims[5] and the Tucker Act of 1887[6] created a concurrent jurisdiction in the Court of Claims and the district courts in suits in contract against the United States. The concurrent jurisdiction of the Court of Claims and the district courts is now limited to claims not in excess of $10,000, while the Court of Claims has exclusive jurisdiction of all claims in contract in excess of that amount. These acts were early interpreted to exclude any actions sounding in tort. Gibbons v. United States, 1869, 8 Wall. 269, 19 L.Ed. 453; Schillinger v. United States, 1894, 155 U.S. 163, 15 S.Ct. 85, 39 L.Ed. 108.

Immunity of the United States to suits in tort was waived in 1946 when the Federal Tort Claims Act was enacted[7] conferring on the district courts:

> "* * * exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place

where the act or omission occurred." 28 U.S.C. § 1346(b).

■ The act was primarily directed towards eliminating the congressional preoccupation with the enactment of private bills compensating individuals for losses sustained as a result of the negligent torts of government employees. S.Rep. No. 1400, 79th Cong., 2d Sess. (1946).[8] However, the act was written broadly to include losses "caused by the *negligent or wrongful* act or omission of any employee of the government." (Emphasis supplied.) See Hatahley v. United States, 1956, 351 U.S. 173, 181, 76 S.Ct. 745, 100 L.Ed. 1065.

Aleutco's claim is for an amount in excess of $10,000. That being so, the District Court could entertain the action only if it was one in tort cognizable under the Federal Tort Claims Act.

■■ In deciding whether the action is one in tort, the nature of the complaint against the United States must be determined. Cf. Nicholson v. United States, 5 Cir., 1949, 177 F.2d 768; United States v. Scrinopskie, 5 Cir., 1950, 179 F.2d 959; Aktiebolaget Bofors v. United States, D.C.D.C.1950, 93 F.Supp. 131, affirmed 1951, 90 U.S.App.D.C. 92, 194 F.2d 145; Fulmer v. United States, D.C. N.D.Ala.1949, 83 F.Supp. 137. The fact that the claimant and the United States were in a contractual relationship does not convert an otherwise tortious claim into one in contract. Cf. Nicholson v. United States, supra; United States v. Scrinopskie, supra.

■■ Aleutco's complaint is a sufficient statement of a cause in tort for conversion,[9] and it would seem that

---

5. 10 Stat. 612 (1855), as amended.

6. 24 Stat. 505 (1887).

7. 60 Stat. 842 (1946).

8. Since the passage of the act, a large percentage of the litigated cases have involved the same type of tortious conduct originally intended to be eliminated from congressional consideration. See 28 U.S. C.A. § 1346, note 154 et seq.

9. In Larson v. Domestic & Foreign Commerce Corp., 1949, 337 U.S. 682, 69 S. Ct. 1457, 93 L.Ed. 1628, the facts were substantially similar to the instant case. In the Larson case the plaintiff sought to enjoin the War Assets Administrator from selling surplus property alleged to have been purchased by the plaintiff. The Supreme Court held that the War Assets Administrator was protected from

Aleutco could have equally well made out a complaint for breach of contract. See 3 Williston on Sales § 595 (Rev.Ed. 1948). Aleutco has chosen to prosecute its action on the basis of tort in the District Court. That it failed to avail itself of an action in the Court of Claims is not a valid jurisdictional objection. So long as immunity of the United States to suit depended upon the distinction between tort and contract, the Supreme Court was careful to preserve the distinction. Thus prior to the Tort Claims Act, rather than extend the liability of the United States under the Tucker Act, the common law privilege of waiving the tort and suing on the contract implied by law was denied. Hill v. United States, 1893, 149 U.S. 593, 13 S.Ct. 1011, 37 L. Ed. 862; Harley v. United States, 1905, 198 U.S. 229, 25 S.Ct. 634, 49 L.Ed. 1029; United States v. Minnesota Mutual Investment Co., 1926, 271 U.S. 212, 46 S. Ct. 501, 70 L.Ed. 911. However, requiring strict enforcement of the distinction in the situation presented in the instant case would be contrary to the purpose for which the Tort Claims Act was enacted. The waiver of the immunity of the United States to suit was the primary purpose of the various enactments conferring jurisdiction on the federal courts to hear such suits. There is little doubt as to Aleutco's ability under the statutes to bring this suit. While only cases "not sounding in tort" are cognizable in the Court of Claims, the jurisdiction of that court has been sustained where elements of both contract and tort were involved in the claim. United States v. Huff, 5 Cir., 1946, 165 F.2d 720, 1 A.L.R.2d 854; Chain Belt Co. v. United States, 1953, 115 F.Supp. 701, 127 Ct.Cl. 38; see Keifer & Keifer v. Reconstruction Finance Corp., 1939, 306 U.S. 381, 395, 59 S.Ct. 516, 83 L.Ed. 784. Likewise. as a result of the Tort Claims Act, there is no policy in the law which requires that the forum of the district court be denied a plaintiff who pleads

such a suit by the doctrine of sovereign immunity. The majority of the Court and the dissenters had no difficulty, how-

and proves a classic case in tort. To do so would neither further nor accomplish Congress' purpose in waiving the immunity of the United States to suit.

## II. *Immunity*

The Federal Tort Claims Act provides that a "tort claim against the United States shall be forever barred unless action is begun within two years after such claim accrues." 28 U.S.C. § 2401(b). The Government contends that the alleged conversion took place no later than 1951, and since this suit was filed by Aleutco on February 23, 1954, the claim is barred.

The District Court found that no act of conversion by the Government occurred prior to July, 1952. A review of the record discloses ample support for this finding.

A detention of goods by one who is charged with some duty with respect to them for the purpose of ascertaining their true ownership or of determining the right of another to receive them will not sustain an action in conversion. Prosser, Torts, § 15, p. 106 (1941); Restatement, Torts, §§ 237–241 (1934).

Here the Government contends that the conversion occurred in the spring of 1951 when Aleutco representatives were denied the right to remove the property. The testimony relied on by the Government establishes little more than a doubt on the part of government officials that property belonging to Aleutco remained in Alaska. Due to the passage of time there would be good reason for the then official representatives of the Government to deny Aleutco access to the property until evidence of ownership was presented. Coy E. Stockard, one of the Government's civilian employees with whom Bill Green, Aleutco's representative, conferred, testified as follows with reference to Green's request to allow Aleutco to remove the property (N.T. pp. 156, 157):

ever, in treating the plaintiff's action as one based on tort.

"A. He stated that he knew what it was, but [and] he could identify it; that if we would let him go up there he could take it; he could find his own stuff and take it. I didn't think that was quite practical because I knew that the Navy owned other material and equipment up there which might easily be identical. We couldn't turn an outfit loose on a Naval base to help themselves to what they thought was their property without first proving that it was their property.

"Q. And that was conveyed to Mr. Green at that time at that conversation?

"A. That was what we attempted to convey to Mr. Green.

"Q. What was his reaction?

"A. He stated that he could produce evidence, *and I stated and Mr. Kotesek [Stockard's superior] stated that if they produced evidence of ownership we would gladly take an appropriate action to release it to them,* but they must give us something to support the claim of ownership. He didn't even have a sales document with him." (Emphasis supplied.)

The letter of September 7, 1951, is to the same effect. It did not contain an unqualified refusal to permit Aleutco to remove the property. On the contrary, it invited Aleutco to continue negotiations with respect to the removal of the property from Dutch Harbor, and it was written upon the express "understanding that any items of material or equipment which can be identified as having been included and offered on War Assets Administration Special Offering, Circular 96, remain the property of the Aleutco Corporation."

It was not improper for the government officials to refuse to permit Aleutco to remove the goods involved until they had ascertained Aleutco's right to them. Not until July, 1952, when the Government shipped the property to Oakland for sale, was there evidenced a tortious exercise of dominion over the property. Since the action could not have accrued until that time, it was timely instituted on February 24, 1954.[10]

### III. *Abandonment*

■ Paragraph 5 of the contract of sale provided that in the event of Aleutco's failure to remove the goods by November 30, 1948 (later extended to October 30, 1949), the Government, upon "15 days written notice" to Aleutco, could treat the property as abandoned by Aleutco and dispose of it without liability. The District Court found that the release of Aleutco from the provisions of the contract contained in the letter of August 2, 1949, covered paragraph 5 of the contract.

Whatever the effect of that release, there is nothing in the record, and the District Court so found, to indicate a proper written notice to Aleutco of the Government's intention to treat the property as abandoned. As earlier observed the letter of September 7, 1951, was merely a qualified refusal to allow Aleutco access to the property. Since the Government never exercised its option to treat the property as abandoned due to its failure to give the required notice, it cannot invoke the provisions of paragraph 5.

### IV. *Damages*

■ While the District Court regrettably did not make specific findings with respect to damages as required by Rule 52 Fed.R.Civ.P., 28 U.S.C., this is not a case like Hatahley v. United States, 1956, 351 U.S. 173, 76 S.Ct. 745, 100 L.Ed. 1065, where apportionment of damages among several plaintiffs com-

10. Nor is this action barred by the specific exception to the act excluding claims "arising out of * * * the interference with contract rights." 28 U.S.C. § 2680(h). This situation is not of the type contemplated for exclusion under that section. Nicholson v. United States, 5 Cir., 1949, 177 F.2d 768; cf. Prosser, Torts § 104 (1941). But see Aktiebolaget Bofors v. United States, 1951, 90 U.S. App.D.C. 92, 194 F.2d 145, 148.

pelled remand to the District Court. The District Court here concluded that the value of Aleutco's property at the time of the conversion was $68,127.50. There is ample evidence to support this finding. Cf. O'Toole v. United States, 3 Cir., 1957, 242 F.2d 308.

Aleutco presented testimony as to the sales values of each item of property listed in Exhibit A of the complaint. Witness Green, Aleutco's director of sales from 1948 through 1951, gave testimony to establish the value of the property, exclusive of marine equipment, pontoon barge, barrels and buoy barrels at $46,127.50. One item listed as "1 Lot of GMC 6 x 6 Parts, made up of Motors, Axles, Transfer Cases, rear ends, etc.", was included in this figure at a value of $10,000. This amount was computed by multiplying $200, the value of one unit of the component parts, by fifty, the lowest estimated number of units which could be grouped together from the "Lot".

Green estimated that the marine equipment, the pontoon barge, barrels and buoy barrels were worth $50,000 to $75,000 at Seattle in 1952. Considering that the marine equipment itself had an acquisition cost of $132,255.50, and that it was unused and some of it was still in unopened cases, a $62,500 valuation for all of the equipment in this category was not unreasonable. Adding this amount to the value of the remaining equipment, the total value of the converted property came to $108,-627.50. Green's estimate of value was an estimate of the sales value of the equipment on the West Coast of the United States in Seattle. In order to ascertain a constructed market value of the equipment at Dutch Harbor where the conversion took place, it was necessary to subtract from the total value the various items of cost which would have been incurred by Aleutco in connection with the sale of its property at Seattle. The cost of chartering a vessel, loading, reconditioning and unloading would have been $40,500, which deducted from $108,627.50 resulted in a value of $68,-

127.50, the amount of Aleutco's judgment.

The District Court based its findings as to damages on the testimony presented on behalf of Aleutco. While the Government contends that the property had only scrap value, the record fairly supports the fact that the property was usable. The measure of damages was adequately based upon reasonable evidence of the fair market value of the property.

For the reasons stated the judgment of the District Court will be affirmed.