Ray B. WOODBURY, Appellant,

v.

UNITED STATES of America, Appellee.

No. 17585.

United States Court of Appeals Ninth Circuit.

Jan. 28, 1963.

King, Miller, Anderson, Nash & Yerke, Norman J. Wiener and Jean P. Lowman, Portland, Or., for appellant.

Joseph D. Guilfoyle, Acting Asst. Atty. Gen., Sidney I. Lezak, Acting U. S. Atty., Alan S. Rosenthal, John W. Boult and John G. Laughlin, Attys., Dept. of Justice, Washington, D. C., for appellee.

Before MERRILL, BROWNING and DUNIWAY, Circuit Judges.

DUNIWAY, Circuit Judge.

Woodbury's appeal comes before us upon a judgment of dismissal for lack of jurisdiction, made final pursuant to Rule 54(b) F.R.Civ.P. There is a counterclaim pending. Both parties accept the trial court's findings as to the facts, embodied in a written opinion, and we take our statement from that opinion.

Woodbury claims the right to recover $853,676.82 from the United States under the Federal Tort Claims Act (28 U.S.C. §§ 1346(b) and 2671–2680). He was interested in constructing prefabricated housing for naval and civilian personnel stationed at the Kodiak Naval Base in Alaska.[1] He organized Aluetian Homes, Inc., which became the sponsor of the project and acquired the necessary land from the Alaska Housing Authority. The project was to be financed under Title II, Section 203, of the National Housing Act.[2] Under this program, a private mortgage agency takes out individual long-term mortgages on each house

[1] The original interest of the government in prefabricated housing was contained in the Veterans' Emergency Housing Act of 1946, 60 Stat. 207, ch. 268, § 12(a). The government functions relating to this program of prefabricated housing were, at that time, vested in the Reconstruction Finance Corporation, a corporation (RFC). The powers of RFC which were applicable to its functions in the field of prefabricated housing were set out in 15 U.S.C. § 603. These powers and functions were transferred to Housing and Home Finance Agency (HHFA) by Reorganization Plan No. 23 of 1950 (64 Stat. 1279, 5 U.S.C. § 133z–15), as limited by statute. By 12 U.S.C. § 1723d the functions of HHFA under Section 2 of Reorganization Plan No. 22 of 1950 were transferred to Federal National Mortgage Association (FNMA) August 2, 1954.

Provisions for the making of loans for prefabricated housing were added as § 102a of the Housing Act of 1948 (62 Stat. 1268) by the Critical Defense Housing Areas Act of 1951 (65 Stat. 293, 12 U.S.C. § 1701g–1).

The powers given the Housing and Home Finance Administrator with respect to prefabricated housing are set forth in 12 U.S.C. § 1701g–2.

Extensive powers are conferred upon the Administrator in 12 U.S.C. § 1749a, to which reference is made in 12 U.S.C. § 1701g–2(b) as being applicable to the prefabricated housing programs.

[2] The Federal Housing Administration (FHA) was established in 1934 with powers, as codified in 12 U.S.C. § 1702. It was transferred as a constituent agency to HHFA by Reorganization Plan No. 3 of 1947 (61 Stat. 954, 5 U.S.C. § 133y–16). The powers to insure conventional mortgages on individual houses are contained in Title II, Section 203, of the National Housing Act of 1934 (48 Stat. 1248, ch. 847, 12 U.S.C. § 1709). That section was amended by the Housing Act of 1954 (68 Stat. 591) to change the value ratio of loans which FHA is authorized to insure thereunder.

Under the provisions of the Alaska Housing Act, FHA was given authority to insure mortgages in Alaska in a dollar amount up to 50% higher than its authority with respect to mortgages on property located in the United States. Further it gave FHA authority to insure mortgages in Alaska without the requirement, applicable to housing in the states, that the commissioner find the project to be economically sound or an acceptable risk (63 Stat. 57, 65 Stat. 315, 12 U.S.C. § 1715d).

in the project. In order to obtain buyers for the mortgages, it was necessary to have a commitment from FHA to insure them. FHA appraised the value of a 344 unit project at $5,904,250 and in April, 1952, issued for a stated period its conditional commitment to insure long-range individual mortgages on each home in a total amount of $4,706,400, which amount was based on 80 percent of the FHA appraised value. FNMA [3] provides a secondary market for the purchase and discounting of mortgages. In 1952, FNMA issued its commitment to purchase at par the individual long-range mortgages as they were obtained by the private mortgage agency and insured by FHA.

It proved impossible to obtain construction financing from private sources, and assistance was then sought from HHFA. A final application was made by Aleutian Homes, Inc., late in 1952 and approved in January, 1953. This interim construction loan by HHFA was in the sum of $4,230,900, which constituted 90 per cent of the amount of the FHA and FNMA commitments with respect to the permanent long-range financing, the application indicating that the difference between the projected costs and the loan amount applied for would be provided for by the sponsor, Aleutian Homes, Inc. The loan was authorized by a Loan Authorization signed by the Administrator, and carried into effect by documents required by a Building Loan Agreement, including a guaranty of the Loan Agreement and the guaranty of the construction contract by Woodbury, and a promissory note and deed of trust. Procedures for disbursement under the loan were provided for in a Loan and Disbursement Agreement executed by Woodbury as President, Aleutian Homes, Inc., April 27, 1953.

Contractual arrangements for the construction of the project under the interim loan from HHFA were signed in Seattle, Washington on April 27, 1953. In general they provided as follows: Aleutian Homes, Inc., as the owner entered into a "general contract" with Kodiak Construction Co. [4] for the construction of the housing project for the payment of the sum of $4,230,900 (the total maximum amount of the HHFA loan). Kodiak Construction Co., as general contractor, in turn, contracted with three subcontractors, plus a freight company. The total payment under these subcontracts, plus freight, equaled the sum of $4,230,-900 (the maximum total amount of the HHFA loan).

In October and November, 1953, financial difficulties arose in connection with the construction of the project, and, on November 6, 1953, Pacific Alaska Contractors, Inc., which was the "site construction" subcontractor, filed a claim of lien against the project for the sum of $150,504.43. Thereupon, construction came to a standstill with the project approximately 75% completed. In November, 1953, demand was made on Woodbury under his guarantee. He failed to comply with the demand. Thereafter, a "completion agreement" was negotiated. In general, it provided for the completion of the construction of the project and the payment order of claimants, creditors and completion costs in four stages. To carry out this program, Aleutian Homes, Inc., Kodiak Construction Co. and Leo S. Wynans Co., Inc., [5] agreed to vest in a Project Manager exclusive authority to take any and all action in connection with the project that they would be authorized to

3. The creation of FNMA and the establishment of its powers is set out in 12 U.S.C. §§ 1716–1723d.

 FNMA was transferred from the jurisdiction of RFC to HHFA to be "administered subject to the direction and control" of HHFA by Reorganization Plan No. 22 of 1950 (64 Stat. 1277, 5 U.S.C. § 133z–15), as limited by statute. By 12 U.S.C. § 1723d the functions of HHFA under Section 2 of Reorganization Plan No. 22 of 1950 were transferred to FNMA August 2, 1954.

4. This company was also organized by Woodbury.

5. This company had the subcontract for the erection of the prefabricated houses.

take, subject to the rights of HHFA defined therein. HHFA was not a signatory to the completion agreement, but approved it in writing. The court found, and we assume that the finding is correct, that HHFA was a party to the agreement.

By April 12, 1955, 341 out of the 343 houses constructed had passed FHA final inspection. The remaining two at that time were unacceptable for reasons relating to their foundations. Under the completion agreement, all claims listed in Stages 1 and 2 were paid, while only some of the claims in Stages 3 and 4 were paid. The permanent individual mortgages were not taken out on any of the 341 houses and during June, 1955, the FHA commitments to insure such mortgages and the FNMA commitments to purchase such mortgages at par expired.

HHFA made advances to or for the benefit of Aleutian Homes, Inc., for project construction costs in the total amount of $4,192,717.10, of which $862,654.42 was paid out subsequent to the making of the completion agreement. Further advances were made in March, 1955. As of June 30, 1957, accrued interest was claimed to be due to HHFA in the sum of $211,105.65.

HHFA on or about June 11, 1957, in the United States District Court for the District of Alaska, Third Judicial Division, Anchorage, commenced foreclosure proceedings in the name of the United States of America against Aleutian Homes, Inc., among others. On June 14, 1957, upon the motion of HHFA, the court appointed a receiver of the mortgaged property until further order . of the court. On or about June 20, 1958, the court authorized the payment by the receiver to HHFA of $200,000 out of proceeds from operation of the project, and that sum was paid to HHFA. On or about September 12, 1958, HHFA amended its complaint by adding additional defendants. On or about April 10, 1959, pursuant to request of the receiver, the court authorized the payment by the receiver to HHFA of $150,000 out of proceeds from operation of the project and that sum was paid to HHFA.

Both in the court below and here, Woodbury contends that HHFA became a fiduciary, not only for Aleutian Homes, Inc. and the other corporations and the creditors involved, but also for Woodbury, and that HHFA breached its fiduciary duties. The claim is stated by the trial court thus:

"That HHFA, its agents and employees, carelessly and negligently or deliberately and wilfully breached said fiduciary relationship by refusing to adopt a permanent long-range program of amortizing the Kodiak project in a manner which considered the claims of all the parties interested in the completion agreement and instead by proceeding to satisfy and prefer its own interests as a creditor from the assets of the project to the exclusion of the interests of said other persons." [192 F.Supp. 933]

The court concluded that an implied obligation of HHFA was to arrange for or provide long-term financing, and that it did not do so. However, it also held, assuming that there was a breach by HHFA of its fiduciary duties, that such a breach was not the "ordinary common-law type of tort" contemplated by the Federal Tort Claims Act, and that therefore it lacked jurisdiction under that Act.

Appellant argues persuasively and at length that breach of fiduciary duty is a tort, even though the duty may be created by contract, and that nowhere in the Federal Tort Claims Act is such a tort expressly excepted from its coverage. (See 28 U.S.C. § 2680, where the exceptions are stated) We assume, for the purposes of this decision, but do not decide, that these arguments are sound as far as they go. A number of cases are cited in support of the proposition that the coverage of the Federal Tort Claims Act is not limited to the "ordinary common-law type of tort." [6] We have no

6. Hatahley v. United States, 1956, 351 U. S. 173, 76 S.Ct. 745, 100 L.Ed. 1065;

Aleutco Corp. v. United States, 3 Cir., 1957, 244 F.2d 674; United States v.

quarrel with them, but we are still of the view that appellant does not have a case under the Act.

Under the federal statutes, jurisdiction of the courts over contract claims against the government is different from jurisdiction over tort claims. Contract claims are covered by the Tucker Act, adopted in 1887 (ch. 359, 24 Stat. 505) and now appearing, as amended, in 28 U.S.C. § 1491, which confers upon the Court of Claims jurisdiction over "any claim against the United States * * * founded * * * upon any express or implied contract with the United States * * * in cases not sounding in tort." The district courts have concurrent jurisdiction of such cases under 28 U.S.C. § 1346(a) (2), but only when the claim does not exceed $10,000. Jurisdiction over tort claims against the government is made "exclusive" to the district courts by 28 U.S.C. § 1346(b).

■ The law applied under the two statutes also differs. It has long been established that the law to be applied in construing or applying provisions of government contracts is federal, not state law. (Ivanhoe Irrigation Dist. v. Mc-Cracken, 1958, 357 U.S. 275, 289, 78 S.Ct. 1174, 2 L.Ed.2d 1313; Priebe & Sons, Inc. v. United States, 1947, 332 U.S. 407, 411 and dissent at 414, 68 S.Ct. 123, 92 L.Ed. 32; S. R. A., Inc. v. Minnesota, 1946, 327 U.S. 558, 564, 66 S.Ct. 749, 90 L.Ed. 851; United States v. County of Allegheny, 1944, 322 U.S. 174, 183, 64 S.Ct. 908, 88 L.Ed. 1209; United States v. View Crest Garden Apts., Inc., 9 Cir., 1959, 268 F.2d 380, 382, cert. denied, 1959, 361 U.S. 884, 80 S.Ct. 156, 4 L.Ed. 2d 120; United States v. Starks, 7 Cir., 1957, 239 F.2d 544, 546; see also National Metropolitan Bank v. United States, 1945, 323 U.S. 454, 456, 65 S.Ct. 354, 89 L.Ed. 383; Clearfield Trust Co. v. United States, 1943, 318 U.S. 363, 366,

63 S.Ct. 573, 87 L.Ed. 838.) It is clear to us that, on principle, federal law must govern the interpretation and application of a contract which is the basis for jurisdiction in an action under the Tucker Act, and it has been so held. (Girard Trust Co. v. United States, 3 Cir., 1945, 149 F.2d 872, 874). The Federal Tort Claims Act expressly provides for liability of the United States for torts "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." (28 U.S.C. § 1346(b)). Under this Act, therefore, state law, not federal law, controls. Thus to permit the result here sought would give to the plaintiff not only a choice of forum (district court rather than Court of Claims where over $10,000 is sought), but also a choice of law.

■■ Many breaches of contract can also be treated as torts. But in cases such as this, where the "tort" complained of is based entirely upon breach by the government of a promise made by it in a contract, so that the claim is in substance a breach of contract claim, and only incidentally and conceptually also a tort claim, we do not think that the common law or local state law right to "waive the breach and sue in tort" brings the case within the Federal Tort Claims Act. The notion of such waiver of breach and suit in tort is a product of the history of English forms of action; it should not defeat the long established policy that government contracts are to be given a uniform interpretation and application under federal law, rather than being given different interpretations and applications depending upon the vagaries of the laws of fifty different states.

Somewhat analogous is the holding in Feres v. United States, 1950, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152, that mili-

Praylou, 4 Cir., 1953, 208 F.2d 291; Rayonier Inc. v. United States, 1957, 352 U.S. 315, 77 S.Ct. 374, 1 L.Ed.2d 354; Indian Towing Co. v. United States, 1955, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48; American Exchange Bank v. United States, 7 Cir., 1958, 257 F.2d 938, 78 A.L.R.2d 879; United States v. Lawter, 5 Cir., 1955, 219 F.2d 559; Somerset Seafood Co. v. United States, 4 Cir., 1951, 193 F.2d 631.

tary personnel sustaining injuries while on active duty, injuries resulting from the negligence of other members of the Armed Forces, cannot recover under the Federal Tort Claims Act. There is no express exception for such cases in that Act, but the Court denied recovery because "the relationship of military personnel to the Government has been governed exclusively by federal law. We do not think that Congress, in drafting this Act, created a new cause of action dependent on local law for service-connected injuries or death due to negligence. We cannot impute to Congress such a radical departure from established law in the absence of express congressional command." (Id. at 146, 71 S.Ct. at 159) So here, we cannot attribute to Congress an intent to permit displacement of federal law in the construction and application of government contracts.

Allowing the plaintiff to waive the breach and sue in tort would destroy the distinction between contract and tort preserved in the federal statutes. As the Supreme Court said in Feres, supra, at 139, 71 S.Ct. at 156, the Tort Claims Act "should be construed to fit, so far as will comport with its words, into the entire statutory system of remedies against the Government to make a workable, consistent and equitable whole." It has been repeatedly held that one having a claim against the government that is essentially one sounding in tort may not "waive the tort and sue in assumpsit," thereby bringing his claim under the Tucker Act as one upon a contract with the United States, even though he could have done so under local law if he were asserting the same claim against a private party. Hill v. United States, 1893, 149 U.S. 593, 598, 13 S.Ct. 1011, 37 L.Ed. 862; Bigby v. United States, 1903, 188 U.S. 400, 403–405, 23 S.Ct. 468, 47 L.Ed. 519; McArthur v. United States, 1894, 29 Ct.Cl. 191, 194; Curved Electrotype Plate Co. v. United States, 1915, 50 Ct.Cl. 258, 269; United States v. Huff, 5 Cir., 1948, 165 F.2d 720, 725, 1 A.L.R.2d 854). We recognize that these cases were decided when the United States had not yet given its consent to be sued for tort, and that they therefore are cases upholding the government's immunity from such claims —a policy since repudiated by the Congress. But it has also been held that, where the cause of action is essentially for breach of contract, the Tucker Act does apply, even though the breach could also be said to be tortious. (United States v. Huff, supra (alternative holding); Chain Belt Co. v. United States, 1953, 127 Ct.Cl. 38, 54–55, 115 F.Supp. 701, 711–712). We note, too, that jurisdiction of tort claims in the district court is "exclusive." (28 U.S.C. § 1346(b)) Read literally, this might have the effect of depriving the Court of Claims of jurisdiction of what are essentially contract cases wherever it is possible to fashion a "tort" out of a breach by the government of its contract. We think that no such result was intended.

We do not mean that no action will ever lie against the United States under the Tort Claims Act if a suit could be maintained for a breach of contract based upon the same facts. We only hold that where, as in this case, the action is essentially for breach of a contractual undertaking, and the liability, if any, depends wholly upon the government's alleged promise, the action must be under the Tucker Act, and cannot be under the Federal Tort Claims Act.

To the extent that the reasoning in Aleutco Corp. v. United States, 3 Cir., 1957, 244 F.2d 674, 678–679, can be said to be contrary to the views here expressed, we decline to follow it. But we do not think that that case is really contrary to our views. It was an action for conversion of property—"a classic case in tort"—as the court stated. We think that in Aleutco the action was essentially one sounding in tort, while here the action is one essentially sounding in contract. There, the breach of contract, if any, was a mere background for the tort —refusal of the government to permit the plaintiff to take possession of property that it owned. The contract was not the essential basis of the claim—rather, it came into the case as a claimed defense

on behalf of the government, which asserted that plaintiff, by breach of contractual arrangements with the government, had forfeited its right to the property. Not so here. Fiduciary duty or not, there can be no liability in this case unless Woodbury can prove (1) an express or implied promise by the government, through HHFA, to adopt and carry out a permanent long range plan to finance the project and (2) a wrongful breach of that promise.

Since it appeared at oral argument that Woodbury also has a case pending in the Court of Claims, the case being held in abeyance pending our decision, we see no need for transferring this case to that court under 28 U.S.C. § 1406(c).

The judgment is affirmed, without prejudice to Woodbury's right to proceed in the case pending in the Court of Claims.