The **REVIEW COMPANY**
v.
The **UNITED STATES.**
No. 429–65.

United States Court of Claims.
May 15, 1970.

Harold L. Winston, Washington, D. C., attorney of record, for plaintiff.

James E. Clubb, Dept. of Justice, Washington, D. C., with whom was Asst. Atty. Gen., Shiro Kashiwa, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

OPINION

PER .CURIAM:

This case was referred to Trial Commissioner Louis Spector with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 57(a) [since September 1, 1969, Rule 134(h)]. The commissioner has done so in an opinion and report filed on July 7, 1969. Exceptions to the commissioner's opinion, findings of fact and recommended conclusion of law were filed by plaintiff and the case has been submitted to the court on oral argument of counsel and the briefs of the parties. Since the court agrees with the commissioner's opinion, findings and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. Therefore, plaintiff is not entitled to recover and the petition is dismissed.

## OPINION OF COMMISSIONER

SPECTOR, Commissioner:

This is an action to recover the sum of $17,522. It is characterized by plaintiff in an earlier cross-motion for summary judgment as a suit "for the use and occupation of real property owned by the plaintiff to the virtual exclusion of the plaintiff therefrom in such a manner as to work an undue and severe hardship on plaintiff and unjust enrichment to defendant, amounting to an implied agreement to pay rent and entitling plaintiff to just compensation under the Fifth Amendment to the Constitution of the United States."

Defendant's motion for summary judgment, and the aforementioned cross-motion were denied by this court May 18, 1968, and the case remanded to the trial commissioner "for trial or other further proceedings." Following a pretrial conference, the case was tried in New York City on October 21, 1968, and the material facts developed at that trial are set forth in appropriate detail in the findings of fact. They are summarized here solely to provide narrative support for this opinion.

Prior to July 17, 1961, defendant owned an 18-acre tract of land in Nassau and Queens Counties, New York, on which were located essentially three large industrial buildings, connected by covered passageways. They are hereinafter referred to as Buildings Nos. 4, 5 and 6. From July 1, 1958 until June 30, 1961, the General Bronze Corporation occupied the entire property under lease from defendant, for the purpose of performing a defense production contract. The plant was in actual operation at least through May 1961, and General Bronze employed a substantial quantity of machinery and other personalty owned by the United States Air Force, along with its own equipment and personalty, in the performance of the aforementioned contract.

At some unspecified time prior to April 10, 1961, General Bronze decided not to renew its lease following its scheduled expiration on June 30, 1961, and defendant acting through the General Services Administration issued an invitation soliciting bids for the purchase or lease of the property. Plaintiff's bid to purchase in the amount of $600,000 was dated and opened April 10, 1961. After further negotiations, plaintiff increased its bid to $650,000 by letter of April 27, 1961, and the latter bid was accepted May 17, 1961.

The above described invitation, bid and acceptance constitute the entire agreement of sale between the parties, as specifically provided in the invitation, which further provided that "[n]o oral statements or representations made by, for, or ostensibly on behalf of either party shall be a part of such contract * * *." There is, in any event, no evidence of any oral statement or representation offered as varying the written agreement.

Section B, paragraph 9, of the Invitation for bids, is the contract provision around which this lawsuit revolves. It provides:

9. In the event Government-owned items of personal property or equipment not included in the Invitation are located on the premises, the General Services Administration reserves the right to remove the same or to hold sales thereof, at the location, together with the right of ingress and egress therefor, for a period of 120 days after closing of title. Any such removal or in-place sale will be conducted in such a manner as to cause the least possible interference with the successful bidder's use and occupancy of the premises.

Plaintiff, in effect, seeks to recover on either of two theories, as follows:

(1) That the Government breached its covenant that "such removal or in-place sale will be conducted in such a manner as to cause the least possible interference with the successful bidder's use and occupancy of the premises."

(2) That, in any event, the Government had a common-law or implied obligation to pay plaintiff the reasonable rental value of the premises, for the period July 17 (the date of closing of title) to August 25, 1961 (the date by which all of defendant's property had been removed).

In other words, the plaintiff charges that even though removal of all Government-owned personal property and equipment was effected within only 39 of the 120 days reserved in the contract for that purpose, either the taking of any time at all after closing of title, or the manner in which the "removal or in-place sale" was conducted, constituted more than "the least possible interference" with plaintiff's use and occupancy of the premises.

There is no basis for this theory of relief in the record. The phrase "least possible interference," although stated in superlatives, must be read, as all such phrases are read, against the background facts in this particular case, and it must be measured against the concept of what was reasonable in these circumstances.

When plaintiff submitted a bid for the purchase of the property, and examined the premises as the invitation required, the plant was in actual operation under a lease to General Bronze, a lease not due to expire until June 30, 1961. It was occupied with literally thousands of individual items of personalty and equipment. The invitation which was part of the contract of sale, reserved a right to remove that property or to hold sales thereof, with right of ingress and egress, for a period of 120 days after the closing of title. Since closing actually occurred on July 17, 1961, the Government's reserved right therefore extended until the middle of November 1961. Complete removal of the Government's property by August 25, 1961, considered solely from the standpoint of *time* consumed, could hardly be deemed a violation of the promise to cause the "least possible interference" with plaintiff's use and oc-cupancy. The latter's insistence that the premises should have been cleared on or prior to the date of closing is entirely without foundation, and it treats the reservation of a period of 120 days thereafter in paragraph 9 of the Invitation above quoted, as if it did not exist.

Nor was the *manner* of removal or in-place sale, a violation of the promise to cause the "least possible interference." Assuming that the time factor, and the manner of removal, are somewhat interrelated, it is necessary to observe at the outset that the process of disposing of Government-owned equipment and other personalty is governed by law and regulation, and that it involves interdepartmental clearances, public sale in response to invitation for bids, donation to public and parochial schools of items not sold, and the usual volume of paper work.

In this case, unusual steps were taken to assure that these procedures caused the least possible interference. Some of the procedures were initiated by the Government and its lessee General Bronze as early as February 1961, by the completion of inventory forms. The forms set forth a description of each item, its cost and condition, and a declaration that it was surplus to the needs of General Bronze.

The forms then had to be processed through an Air Force quality control representative, who had to visit the plant, inspect the equipment for proper working condition, and determine its possible usefulness on other Air Force projects. Next, everything had to be catalogued and "screened" for possible use by other agencies within the Department of Defense, a process which often takes up to 90 days. Only then could shipping instructions be issued. Whenever feasible, papers were hand-carried and the telephone was employed rather than the mails, in order to expedite the removal procedures.

Four days before closing of title (by July 13, 1961), all equipment owned by defendant had been removed from Build-

ings Nos. 5 and 6, and these buildings were available for use and occupancy by plaintiff on the date of closing. There remained in Building No. 4 on the date of closing about 50 pieces of heavy machinery, some weighing as much as 90 tons. Smaller items, such as desks and chairs, were also collected and stored in Building No. 4 on that date.

Concentration of all remaining property in Building No. 4 was a sound procedure because the heavy equipment was already there, and because it was the only building equipped with an office and telephone. These facilities were essential to the proper protection and disposition of the property by sale, donation, or otherwise. Sale of smaller items in response to an invitation for bids was completed on July 24, 1961, and removal by purchasers was required by July 28, 1961.

Moving of the heavy equipment required preparation by an expert rigging contractor, and the successful bidder began its work early in June 1961. In accordance with specifications, each machine was disassembled, cleaned, sprayed with preservative, and shrouded. Large and heavy parts were placed on wooden platforms or skids, and related smaller parts were wrapped, boxed and attached to the skids. After the skids were placed on trailers, they had to be blocked to prevent shifting and damage in transit. All of this was a time-consuming and delicate task, and the testimony indicates that it would consume, with necessary Air Force inspection, from 15 to 21 work days to prepare a 90-ton machine for transport.

Plaintiff's witnesses testified that, when Building No. 4 was cleared, property was then moved through the passageway to Building No. 5, through that building, through the passageway to Building No. 6 and then loaded from a platform serving Building No. 6, thus depriving plaintiff of the use of any of the buildings until Building No. 4 had been emptied. But a clear preponderance of the evidence indicates otherwise.

Building No. 4 was a hangar-type structure, and trucks could be and were driven directly through its large doors, the property loaded directly thereon, and directly removed, without disturbing Buildings Nos. 5 and 6.

On this issue of "least possible interference," and not for the purpose of demonstrating damages, if any, plaintiff was permitted to introduce evidence relating to alleged frustration of its special plans for the property. A witness testified that there existed but a single meter for each utility serving all three buildings, making it impossible for plaintiff to find an industrial lessee for less than the entire premises. But at the date of trial, approximately six separate lessees were occupying various parts of the premises simultaneously, indicating that the meter problem was not insurmountable. Moreover, on September 11, 1961, plaintiff did rent a portion of the premises to General Motors Corporation under a lease providing that the lessee "shall pay for its consumption of electricity and water on a metered basis." When it is remembered that the defendant had reserved the right to remove its property or to hold sales thereof, with the right of ingress and egress, for a period of 120 days or until mid-November 1961, plaintiff could hardly have formulated reliable plans to lease the premises prior thereto, although it actually did.

In summary, Buildings Nos. 5 and 6 were available to plaintiff on the day of closing, and the remaining Building No. 4 was made available 39 days thereafter. On the basis of these facts, and the manner of removal above described, it is found that defendant caused the least possible interference with plaintiff's use and occupancy of the premises.

This conclusion and the foregoing facts also negate plaintiff's second theory that there was created an implied obligation on the part of defendant to pay rent from and after the date of closing. There is no mention of rent in de-

fendant's express reservation of a right in the contract to remove its property for a period of 120 days after closing. Nor can such an obligation be reasonably implied from the wording selected, nor the circumstances which actually transpired.[1]

For all of the foregoing reasons, it is concluded that plaintiff is not entitled to recover and that its petition should be dismissed.

---

1. *Cf.* Chain Belt Co. v. United States, 115 F.Supp. 701, 127 Ct.Cl. 38 (1953).